Filed 3/11/22  P. v. Zumini CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDREW ZUMINI,<br><br>    Defendant and Appellant. | D079447<br><br><br>(Super. Ct. No. C1365185) |

APPEAL from a judgment of the Superior Court of Santa Clara County, Vanessa A. Zecher, Judge.  Reversed and remanded.

Solomon Wollack, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Donna M. Provenzano, and Victoria Ratnikova, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Andrew Zumini, on trial for the first degree murder of his father, sought to introduce evidence of his father's history of threats and violence toward Zumini and others.  The trial court excluded this evidence on

the ground that it was irrelevant to Zumini's claims that he acted in self-defense or the heat of passion when he killed his father. After deliberating for several days, the jury convicted Zumini of first degree murder and also found true the allegation that he personally and intentionally discharged a firearm causing death.

Zumini contends on appeal that the trial court abused its discretion by excluding evidence of his father's prior threats, and that this error was prejudicial. We agree and therefore reverse the judgment on that ground.

FACTUAL AND PROCEDURAL BACKGROUND

Zumini shot his father, Anthony Zumini (Tony), on the night of September 6, 2013. When police arrived at the scene, Tony was pronounced dead. Next to Tony's body, police found a folding knife with the blade still inside the handle. The knife was identified as the pocketknife Tony carried on his waistband. Police searched Tony's residence and found no other weapons or any illegal contraband.

Police arrested Zumini a few hours later. Zumini led officers to the storm drains where he had discarded the gun and the magazines he used during the shooting. A firearms expert matched the bullets and casings recovered from the scene and Tony's body to the gun recovered from the storm drain.

A forensic pathologist performed an autopsy of Tony's body, concluding the cause of death was multiple gunshot wounds. Tony had been shot a total of nine times. Six of the nine shots in Tony's body were fatal by themselves, and there was one potentially fatal shot to the lumbar spine which would have rendered Tony unable to walk. Eight of the nine gunshot wounds were inflicted from the back. The wounds were inflicted at a distance exceeding two to three feet.

2

On February 5, 2015, the prosecution charged Zumini with Tony's murder (Pen. Code, § 187, subd. (a)), and with an enhancement for personal discharge of a firearm resulting in death (*Id.*, § 12022.53, subd. (d)).  A jury was empaneled on July 17, 2018.

A.     *Zumini's Testimony*

Zumini testified at trial that he lived with Tony for the first five years of his life.  He claimed he feared Tony when he was a child, but the fear "lessened or went away" after Tony and Zumini's mother split up.  When Zumini was older, he and Tony had an "on and off" relationship.  They mainly communicated through Zumini's older brother and lived together for one and a half months when Zumini was 21 years old.  They often had disagreements when Tony would ask Zumini to do things he did not want to do, or because Zumini did not want to break the law.

Zumini's relationship with Tony improved once Tony found out Zumini's girlfriend at the time, Gabby Assaad (Assaad), was pregnant.  After the baby was born, Assaad and the baby moved in with Tony.  Zumini was "comfortable" with this arrangement and would visit every day.

By July 2013, Zumini and Tony's relationship had become strained.  Zumini heard that Tony was "going to start rounding up people and come up by [Zumini's] house."  Zumini also learned that Tony and Zumini's half-brother, Raymond Lizotte (Lizotte),[1] were "making threats and bringing people by [Zumini's] house."  Zumini feared that Tony was going to hurt him, Assaad, or his daughter, and he retaliated by making "all kinds of threats" against Tony.

Around that time, Zumini started keeping knives, pepper spray, and bear spray in his car.  In mid-August, he purchased a semi-automatic

_____

[1]     Zumini and Lizotte have different mothers.

3

handgun, which he also kept in his car. He paid hundreds of dollars more for the unregistered gun rather than pay the retail price from a licensed gun seller because he wanted the gun immediately. The gun came with two magazines filled with hollow-point bullets, which inflict more physical damage when fired.

On September 6, 2013, Zumini decided to drive to his father's residence and confront him. A neighbor told Zumini that her video surveillance footage showed Tony's car parked outside Zumini's house earlier that morning around 1:00 a.m. This information "elevated" Zumini's fears about Tony.

Around 6:30 p.m. that evening, Zumini called Tony, Tony's girlfriend, and Lizotte to announce that he was coming over. When he called Lizotte, Zumini said something to the effect of, "Where was [their] punk ass father at?" and "[F]uck you, and fuck him." Zumini later testified, however, that the decision to drive over to his father's residence was "last minute" and "[s]pur of the moment."

When Zumini arrived at Tony's residence around 9:30 p.m., he saw Tony and Lizotte outside and looking in his direction. He also saw Lizotte throw his arms up in what Zumini interpreted as "a challenging gesture[.]" Neither Tony nor Lizotte said anything. Rather than drive off, Zumini decided to confront them, rolling up his window and locking his door, because he feared Tony or Lizotte might attack first.

As Zumini drove past them, Lizotte hit Zumini's back window. Zumini also saw Lizotte pull a bandana over his face and begin wrapping his hand or putting on a glove. Zumini believed this meant Lizotte was preparing to fight. Still, Zumini's attention remained focused on Tony. Zumini explained he only feared Lizotte when their father was around, because Lizotte "is

4

always less of a threat." Zumini's concern grew when he noticed a third person, whom he did not recognize, standing behind Tony.[2]

Zumini admitted that he had another opportunity to drive off, but he decided instead to stop the car. He explained that the situation had progressed into "the type of stuff [Zumini] was getting tired of [Tony and Lizotte] doing, and [he] wanted them to stop that type of stuff." Zumini believed that if he drove away, "they [would] keep coming to [his] house."

Before getting out of the car, Zumini grabbed his gun. When asked why he pulled the gun out of the car, Zumini stated, "Because I wanted them to see me with a gun and take the threat serious . . . That I was capable of showing up at their place with a gun." He explained that he had planned on displaying the gun all along and hoped this would intimidate Tony to "back off[.]" He also intentionally left the gun loaded and had the second magazine with him in case the situation "[got] out of hand." He claimed, however, that he never intended that night to kill Tony or even point the gun at him.

Once out of the car with the gun, Zumini yelled something along the lines of, "What's up motherfucker? You wanna run up on me, you little bitch." According to Zumini, Tony was standing about seven to nine feet from him and began moving in his direction without saying anything.[3] Zumini testified that seeing Tony silently move towards him made him fear that he would be seriously injured or killed. He interpreted this behavior to mean

---

[2] The third person, whom Zumini did not recognize at the time, was Tony's neighbor.

[3] Lizotte, who also testified at trial, first estimated that Zumini stopped about ten to 12 feet away from where he, Tony, and the neighbor were standing, but then later testified on cross that Zumini stopped around 50 feet from them. Lizotte further testified that he, Tony, and the neighbor were all standing still and never approached Zumini before Zumini started shooting.

5

Tony's "mind [was] already made up. There's not going to be any talking." Zumini believed Tony was armed with the switchblade he always carried and feared he could possibly be armed with another weapon, such as a gun. However, Tony had not displayed his switchblade or brandished any weapons.

Zumini fired one shot in Tony's direction, and Tony "took off" on foot. Zumini acknowledged once again that he could have driven off but testified that his mind "zoomed in" on Tony, and he decided to chase after him. Zumini claimed that he believed Tony was retreating to grab a weapon or "gear up for something," and Zumini "was just worried about stopping him." Yet when asked by defense counsel if he was on "automatic pilot" after firing the first shot, Zumini responded, "Yeah. I didn't think after that."

Zumini kept shooting while he chased after Tony at "full speed." He continued firing even after Tony fell to the ground, only stopping once he had emptied the gun. In total, Zumini shot his father nine times.

After the shooting, Zumini drove off and began getting rid of the evidence. He threw the gun and the magazines into two separate storm drains. He then drove to another location to discard his clothes and change into a set of spare clothes he kept in his car. While driving around, Zumini called his sister, who told him his father had been shot and killed and that he was a suspect. He later sent a text message to Assaad, stating, "Chilling. And you?" He also called an ex-girlfriend. He eventually decided to drive home and wait for the police, and he was arrested soon after.

B.   *The Trial Court's Exclusion of Tony's Prior Threats*

At trial, the defense sought to introduce evidence to the jury regarding Tony's prior threats, filing a "motion in limine to admit evidence of factors affecting [Zumini] as a victim of long-term abuse." The defense intended to

6

call witnesses to testify regarding a "years-long campaign of abuse, violence, and relentless menacing by the decedent" against Zumini and others. Specifically, when Zumini was five years old, he allegedly observed Tony physically and emotionally abuse his mother. Then, leading up to the shooting, Tony allegedly harassed and threatened to kill Zumini. This included occasions when Tony brandished a knife at Zumini, initiated high speed car chases, and attempted to stab Zumini's tires. Tony also drove by Zumini's house "many" times at odd hours, and often with others in his car, to frighten Zumini, and he also left Zumini threatening phone calls, texts, emails, and voicemails. Tony also told other individuals that he was planning to harm Zumini, and Zumini was made aware of these threats. Based on Tony's threatening behavior in the summer of 2013, Zumini attempted to obtain a restraining order against Tony, which was denied several weeks before the shooting.

In addition to family members and other individuals familiar with Tony's violent past, the defense also intended to call "well-regarded domestic violence expert," Richard Ferry, M.S., a licensed marriage and family therapist. The defense contended Ferry's testimony was "germane" to Zumini's mental state at the time of the charged crime and would describe "how [Zumini's] actions over time reflected coping strategies of chronic violence victims, and how Tony's ceaseless and escalating intimidation—up to and including death threats—pushed [Zumini] into a state of sustained fear and hypervigilance also common in victims of continuing violence; particularly for [Zumini's] baby daughter, who was among those endangered by Tony's senseless cruelty."

Attached to the motion was Ferry's report, which discussed the significance of Tony's abusive conduct towards Zumini, as well as strategies

Zumini developed to respond to the abuse. Although Ferry did not offer a formal diagnosis in his report, he indicated that Tony's behavior caused Zumini to develop "sustained fear," "hypervigilance," a "sense of isolation," and "aloneness." In Ferry's opinion, "[Zumini] was trying to encourage his father to stop his campaign of abuse, de-escalate the situation and neutralize the power imbalance by a display of his capability to inflict an equal damage on [Tony]."

The prosecution opposed the motion in limine and filed a "motion to exclude prior bad acts and other evidence." The prosecution's primary contention was that the proffered evidence related to Tony's prior bad acts was irrelevant because Zumini did not act in the heat of passion or in self-defense when he shot his father. The prosecution also contended such evidence should be excluded to the extent Zumini was not personally aware of the prior acts when he killed his father; the proffered witness statements were far more prejudicial than probative; and there were various evidentiary problems with each proffered defense witness.

The prosecution additionally contended that admission of evidence related to Tony's prior violence would open the door for the prosecution to introduce evidence regarding Zumini's own character for violence, including various threats Zumini made against Tony in the summer of 2013. In one incident identified by the prosecution, Zumini brandished a bat at Tony and admitted to throwing a bottle and breaking Tony's kitchen window. In another incident, Zumini admitted to chasing and trying to fight Tony. The prosecution was also prepared to introduce evidence regarding Zumini's prior acts of violence against Assaad, which included "hit[ting]" and "pok[ing]" her in the vagina, threatening to kill her, and locking her out of the house.

8

The prosecution further argued that evidence of Zumini's mental health disorders and other psychological conditions was irrelevant, noting various problems with Ferry's report. For instance, Zumini was not a victim of intimate partner battering, the subject of Ferry's expertise. Additionally, the focus in the report on events from Zumini's childhood created a substantial risk of confusing the jury.

In a memorandum of points and authorities, defense counsel maintained that Ferry's testimony was admissible. Counsel clarified that Ferry's expertise related to "victims of chronic abuse," and his expert opinion was relevant to corroborating Zumini's testimony that he brought the gun to the confrontation with his father even though he never intended to use it.

During a hearing on the motions in limine, the court ruled that Zumini would not "be able to automatically testify as to the history of the relationship with his father." Defense counsel indicated at the hearing that the defense's theory was not primarily self-defense or imperfect self-defense, but rather "prolonged provocation" by the decedent. The court responded that Zumini would need to lay a legally sufficient basis for provocation before the family history evidence could be admitted. Thus, if Zumini decided to testify, the defense would "need to start with the circumstances as to what happened that day and work backwards," and the parties would then litigate which prior incidents would be admissible. The court further acknowledged that admission of Tony's prior bad acts would trigger the prosecution's ability to introduce Zumini's prior bad acts in rebuttal.

In subsequent filings, the defense contended the family history evidence was relevant to corroborate Zumini's state of mind, and Zumini was therefore constitutionally entitled to testify "without fetters." The defense indicated that Zumini was prepared to testify that "he did not go to his

father's house with the intent to kill but to confront him[.]" Thus, his father's "extreme campaign of ongoing criminality" was relevant to corroborating Zumini's testimony that he brought the gun with him to confront his father but never intended to use it. According to the defense, it would be a violation of Zumini's constitutional rights for the trial court to restrict Zumini from testifying about his father's prior threats, claiming, "The defendant has a constitutional right to testify to his own mental state at the time of the acts constituting the alleged offense, and to the reasons he had that mental state." Defense counsel continued to raise this argument at a hearing, claiming that the family history evidence showed that Zumini did not go to his father's house with a "preformed intention of malice aforethought." Instead, the family history evidence demonstrated that Zumini merely intended to "confront" his father, "[t]o tell him, leave me alone. Leave my baby alone. Leave my baby's mother alone. I want you out of my life. Leave me alone."

The trial court held a hearing under Evidence Code section 402[4] to assess the admissibility of Ferry's proposed testimony. Ferry testified at the hearing that his "diagnostic impression" or "working diagnosis" of Zumini— meaning he did not run any diagnostic tests—was that Zumini had generalized anxiety disorder and complex post-traumatic stress disorder (PTSD).[5] The characteristics associated with these diagnoses included nervousness, restlessness, and hypervigilance. The diagnoses were based on Tony's conduct towards Zumini and his family when Zumini was between two and 11 years old, and Ferry believed the diagnoses were "probably in play" at

---

[4]     All further undesignated statutory references are to the Evidence Code.

[5]     Complex PTSD refers to PTSD caused by many, repetitive events rather than a single event. The symptoms of complex and regular PTSD are the same, regardless of the circumstances that led to the condition.

the time of the shooting. Ferry testified that Tony's conduct during Zumini's adulthood "could have been provocative" and "could have increased his hypervigilance, but the [PTSD] diagnosis was already there." However, Ferry had never been qualified as an expert in generalized anxiety disorder or PTSD. He also had no experience serving as an expert witness in any domestic violence cases involving violence between a father and son. Rather, his expertise was mainly limited to intimate partner battering, specifically "the dynamics between a man and a woman who are in a romantic relationship when there's abuse, and the effects of that abuse on the woman in the relationship."

Following additional arguments from the parties and after hearing Zumini's testimony, the court ruled to exclude evidence related to Zumini's family history, apart from evidence regarding threats made on the day of shooting. Although the court recognized that it was obligated to give a self-defense instruction "if even a scintilla of evidence is present with respect to a self-defense theory," the court disagreed with defense counsel's argument that Zumini's general fear of his father could support his claim that he acted in self-defense on the day of the shooting. Additionally, even though Zumini had a general fear of his father, his testimony did not establish a fear of imminent death or great bodily injury. The court additionally found that Tony and Zumini's prior history was not relevant "given the lack of provocation, [and] the bereft nature of the record with respect to [Tony's] provocation on the date in question . . . ." To the extent the court agreed with defense counsel that the shooting was the result of a "battle of dominant alpha male and his beta son," the court concluded that this was not a cognizable legal defense. The court clarified at a later hearing that it excluded evidence related to Tony's prior bad acts, because the defense had

11

failed to present sufficient evidence to support a finding of provocation or a need for self-defense.

The court also rejected the defense's argument that the family history evidence was admissible to corroborate Zumini's state of mind. Although the defense had contended that the family history evidence tended to show that Zumini did not arrive at his father's house on the night of the shooting intending to shoot his father, the court noted that "there's a big gap" between Zumini arriving at his father's house and when he "eventually shot [his father]."

As to Ferry's testimony, the court ruled that Ferry was permitted to testify. However, the court limited Ferry's testimony to Zumini's diagnoses for generalized anxiety disorder and PTSD; "a general opinion as to what the lens looks like for someone who has PTSD"; and how a person with PTSD "view[s] certain situations." The court emphasized that Ferry's testimony was "not an opportunity for [the defense] to get the entire history of the relationship between . . . Zumini and his father before the jurors."

Defense counsel ultimately decided not to call Ferry as an expert witness, contending that Ferry's opinion would be "vitiated" if he was prevented from explaining that the basis for his opinion was the abusive relationship between Zumini and his father. Additionally, the prosecution had retained an expert to challenge Ferry's opinion, and defense counsel was concerned the trial would devolve into "a battle of the experts."

Defense counsel also decided not to call its character witnesses, who were intended to testify about Zumini's "character for honesty and peacefulness." These witnesses would have opened the door for the prosecution to ask about Zumini's prior acts of violence, and without evidence

of Tony's prior bad acts before the jury, counsel concluded it was not in Zumini's best interest to have the character witnesses testify.

C.     *Jury Instructions, Verdict, and Sentence*

After the close of evidence, the prosecution argued that substantial evidence did not support jury instructions for heat of passion, perfect self-defense, or imperfect self-defense.  The court agreed with the prosecution that an instruction for heat of passion was unwarranted, finding no substantial evidence to show that Tony's demeanor on the night of the shooting provoked Zumini.  The court, however, rejected the prosecution's arguments on self-defense, electing to instruct the jury on both complete self-defense and voluntary manslaughter due to imperfect self-defense.

The jury deliberated for several days and returned a verdict finding Zumini guilty of first degree murder and the firearm enhancement.  The trial court sentenced Zumini to 50 years to life in prison, consisting of consecutive 25-year-to-life terms on the murder count and the firearm enhancement.

Zumini timely appealed.

DISCUSSION

Zumini contends that the trial court abused its discretion and violated his federal constitutional right to present a defense by excluding "extensive evidence about Tony's prolonged campaign of violence against him and his loved ones—especially during the summer of 2013."  He argues that "[t]he court's ruling destroyed [his] credibility as a witness, eviscerated his claims of self-defense and heat of passion, and prevented him from answering key questions like why he decided to confront Tony at gunpoint."  The Attorney General counters that evidence related to Zumini's family history was properly excluded, and that any error in excluding this evidence was harmless given the strength of the other evidence presented at trial.

13

We conclude that the trial court abused its discretion by excluding evidence related to Tony's prior threats. Once the court elected to instruct the jury on self-defense, the explicit terms of the self-defense instructions made Tony's prior threatening behavior relevant, and thus such evidence should have been admitted. Further, evidence of the prior threats was relevant to Zumini's state of mind because it was material to his claim that he did not commit the shooting with the mens rea required for first degree murder. Because evidence regarding Tony's prior threats was critical to Zumini's self-defense and heat of passion claims, we conclude that Zumini was prejudiced by the erroneous exclusion of this evidence.

A.    *General Legal Principals*

First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*).) Malice can be negated if the defendant acted in self-defense. There are two types of self-defense under California law: "perfect" self-defense and "imperfect" self-defense. (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on other grounds in *Chun*, at pp. 1198-1199.) Both types require that the defendant actually believe he was in "imminent danger of death or great bodily injury[.]" (*Randle*, at p. 994.) If that belief is reasonable " 'from the point of view of a reasonable person in the [defendant's] position,' " the defendant has acted in perfect self-defense and the killing is not considered a crime. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083 (*Humphrey*); Pen. Code, § 197, subd. (1).) If the belief is objectively unreasonable, the defendant is considered to have acted in imperfect self-defense and the crime is reduced to voluntary manslaughter. (*People v. Elmore* (2014) 59 Cal.4th 121, 134.) "[F]or either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future

14

harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' " (*Humphrey*, at p. 1082.)

Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation. (*Chun, supra*, 45 Cal.4th at p. 1181.) Premeditation and deliberation may be negated by heat of passion arising from provocation. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296 (*Fitzpatrick*).) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. [Citation.] If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter. [Citation.]" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).)

A defendant's evidence related to self-defense or heat of passion is subject to the ordinary evidentiary rules. (See § 351 [all relevant evidence is admissible unless prohibited by statute].) This includes the limitations set forth by sections 350 and 352, meaning the evidence must be relevant and that relevance must outweigh any prejudicial impact the evidence might have on the jury. (See *In re Christian S.* (1994) 7 Cal.4th 768, 783 (*Christian S.*).) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) " 'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117.) At the same time, the trial court retains the

15

discretion under section 352 to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will" either "necessitate undue consumption of time" or "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

Additionally, a defendant may not offer evidence of the victim's character or trait to prove conduct on a specified occasion. (§ 1101, subd. (a).) " 'The reason for this rule is not that such evidence is never relevant; to the contrary, the evidence is excluded because it has too much probative value.' [Citations.] ' "The natural and inevitable tendency" ' is to give excessive weight to the prior conduct and either allow it to bear too strongly on the present charge, or to take the proof of it as justifying a conviction irrespective of guilt of the present charge. [Citations.]" (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.) This general rule set forth by section 1101 is subject to an exception where "evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted" is "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (§ 1103, subd. (a)(1).)

We review for abuse of discretion the trial court's ruling on the admissibility of evidence. (*People v. Harris* (2005) 37 Cal.4th 310, 337.) "Abuse may be found if the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner, but reversal of the ensuing judgment is appropriate only if the error has resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 587-588, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

16

B.     *Admissibility of Evidence of Prior Threats*

Before ruling on Zumini's motion in limine, the trial court indicated that it would first need to hear testimony from Zumini about events on the day of the shooting.  According to the court, Zumini was not "automatically" entitled to testify about his relationship with his father, and would "need to start [his testimony] with the circumstances as to what happened that day and work backwards."  The court indicated that if Zumini laid "a legally sufficient foundation" for his self-defense or heat of passion claims through his testimony, then Tony's prior bad acts could potentially be admissible under section 1103.

Following this ruling, Zumini testified over the course of several days about his thought process on the day of the shooting.  He stated that he decided to drive to his father's residence on September 6, 2013, after hearing from a neighbor that his father had parked by his house earlier that morning.  He purposefully brought with him to the confrontation a gun loaded with hollow-point bullets along with a second magazine, intending to display the gun and intimidate Tony to "back off."  When Zumini arrived, Tony was outside with Zumini's half-brother and a third individual.  Zumini's half-brother hit Zumini's back window, and rather than drive off, Zumini decided to stop the car.  Zumini exited the car with the gun, and yelled "What's up motherfucker?  You wanna run up on me, you little bitch."  According to Zumini, Tony then moved in his direction, without saying anything and without brandishing any weapons.  Yet Zumini believed Tony was possibly armed with a knife or gun, and he feared he would be seriously injured or killed.  Zumini responded by firing one shot in Tony's direction, and the three men scattered and ran off.  Although Zumini admitted he had another opportunity to drive away, he chased after Tony instead, shooting at Tony to

17

stop him from arming himself or "gear[ing] up for something." Zumini continued to fire even after Tony fell to the ground, only stopping once he had emptied the gun.

After hearing this testimony, the trial court ruled to exclude evidence related to Zumini's family history. The court's ruling was based in part on a finding that Zumini's own testimony had precluded him from asserting a self-defense claim. The court indicated that it was obligated to admit evidence relevant to self-defense if there was even a "scintilla of evidence" presented to support a self-defense theory, but that Zumini had failed to establish a self-defense claim since his own testimony established that he did not fear imminent death or great bodily injury when he committed the shooting. Thus, aside from evidence regarding threats made on the day of shooting, the court concluded that Zumini's proffered family history evidence should be excluded as irrelevant.

Zumini correctly notes that this evidentiary ruling was inconsistent with the court's subsequent ruling to instruct the jury on self-defense. On the issue of the jury instructions, the prosecution argued that Zumini's own testimony rendered him ineligible for a self-defense instruction. The court, however, rejected this argument and ruled that the jury would receive a self-defense instruction. To support its ruling, the court explained, "I think this is dangerous. If the Court is wrong on this, the case is reversed. Period. So it may be the more prudent course—and I am saying this—I'm just going to ask you to think about this. To give a self-defense instruction—it may well be imperfect self-defense factually. I[t] may not—that's certainly for the jurors to decide. [¶] But I'm thinking that it may be appropriate to have the jurors decide whether this is a self-defense issue or an imperfect self-defense issue, or neither."

However, by instructing the jury on self-defense, the court impliedly found that there was substantial evidence in the record to support Zumini's self-defense claims. "The trial judge [has] a responsibility to correctly instruct the jury and limit argument to defenses supported by substantial evidence." (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386.) "It defeats the policy judgments of the courts and the Legislature to allow a defendant to receive an instruction on a defense, and to allow a jury to excuse criminal conduct, when the defendant purports to rely on a defense for which substantial evidence does not exist. Dangerous persons could go free. Moreover, such an instruction will often confuse a jury because the jury will probably wonder why it has received an instruction on a defense for which there is no substantial evidence." (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1059.) Thus, the court's election to instruct the jury on self-defense required it to find substantial evidence that Zumini acted in self-defense when he shot his father, such that the jury would be entitled to find Zumini not guilty of first degree murder. Such ruling is plainly inconsistent with the court's earlier evidentiary ruling, in which the court found there was not a scintilla of evidence to show Zumini had acted in self-defense.

We recognize that threats by the victim do not alone establish self-defense, as there must be evidence the defendant feared imminent, and not just future, harm. (*People v. Minifie* 13 Cal.4th 1055, 1068 (*Minifie*); see also *Christian S.*, *supra*, 7 Cal.4th at p. 783 [perfect and imperfect self-defense require "an *actual* fear of an *imminent* harm."].) Any right of self-defense is also limited to the use of such force as is reasonable under the circumstances and does not extend beyond the time of real or apparent danger. (*Minifie*, at p. 1064; *People v. Pinholster* (1992) 1 Cal.4th 865, 966, disapproved of on other grounds by *People v. Williams* (2010) 49 Cal.4th 405.) Moreover, a

19

defendant cannot invoke perfect or imperfect self-defense where "through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), [he] has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Enraca* (2012) 53 Cal.4th 735, 761.)

Notwithstanding these legal principles regarding self-defense, once the court elected to give the self-defense instructions, it undermined the very rationale it had used to exclude Zumini's evidence and, more importantly, deprived the jury of the ability to consider evidence that was material to those instructions. Here, the jury instructions the court provided expressly required the jury to consider Tony's prior threatening conduct. The court instructed the jury on perfect self-defense with CALCRIM No. 505, which stated: "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. [¶] . . . [¶] If you find that Tony Zumini threatened or harmed the defendant in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. [¶] Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person." The court also instructed the jury on imperfect self-defense under CALCRIM No. 571, which similarly provides: "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] . . . [¶] If you find that Tony Zumini threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs. [¶] If you find that the defendant knew that Tony Zumini had threatened or harmed others in the

20

past, you may consider that information in evaluating the defendant's beliefs."

These jury instructions, by their own terms, entitled the jury to consider evidence of prior threats Tony made to Zumini and others. It was therefore an abuse of discretion for the court to instruct the jury to consider Tony's prior threats, while at the same time excluding evidence of the prior threats as irrelevant. (See *People v. Rist* (1976) 16 Cal.3d 211, 219 ["[J]udicial discretion is by no means a power without rational bounds. ' ". . . The term [judicial discretion] implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason." ' "], superseded by statute on other grounds as stated in *People v. Collins* (1986) 42 Cal.3d 378, 393.)

In addition to highlighting the court's inconsistent rulings regarding Zumini's self-defense claims, Zumini further asserts that evidence of Tony's prior threats was relevant to establishing his state of mind. He argues that the exclusion of his own testimony was erroneous because it was relevant to negate the elements of malice, premeditation, and deliberation, thus showing he did not act with the mens rea required for first degree murder. He asserts that knowledge of a victim's past violence "either through personal experience or word of mouth . . . may be relevant to show that [the defendant] lacked the state of mind necessary to commit the charged crime."

" 'A person claiming self-defense is required to "prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." [Citation.]' " (*Minifie*, *supra*, 13 Cal.4th at p. 1065.) The reasonableness of the defendant's fear is determined from the point of view of a reasonable

21

person in the defendant's position. (*Humphrey*, *supra*, 13 Cal.4th at p. 1083; *Minifie*, at p. 1068.) Further, a defendant claiming self-defense is entitled to have the jury consider all the facts and circumstances that might be expected to operate on his state of mind. (*Humphrey*, at p. 1083.)

Similarly, a heat of passion defense for voluntary manslaughter has two components, one subjective and the other objective. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The subjective component is the defendant's state of mind, showing that he in fact acted in a heat of passion. (*Ibid.*) When a person attempts to kill while acting in the heat of passion, even if exercising a sufficient "measure of thought . . . to form . . . an intent to kill," he or she acts with "a mental state that precludes the formation of malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) The test of whether provocation or heat of passion can negate premeditation and deliberation so as to reduce first degree murder to second degree murder also requires a subjective determination of the defendant's state of mind. (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678 (*Padilla*); *Fitzpatrick*, *supra*, 2 Cal.App.4th at p. 1295.)

In this case, Zumini was entitled to present evidence bearing upon his state of mind and the reasonableness of his interpretation of Tony's actions to support his self-defense and heat of passion claims. Because a defendant's " 'perceptions are at issue,' " prior known threats by the victim " 'may color [the defendant's] perceptions of that individual.' " (*Minifie*, *supra*, 13 Cal.4th at pp. 1065-1066.) Evidence of prior threats may also justify the defendant "in acting more quickly and taking harsher measures for [his] own protection in the event of assault, whether actual or threatened, than would a person who had not received such threats." (*People v. Bush* (1978) 84 Cal.App.3d 294, 302-303.) Zumini testified that although he hoped to "intimidate" Tony

on the night of the shooting, he did not plan to shoot or even point the gun at him. Instead, he merely intended to "have the gun on [him] and let [Tony] know, here it is[.]" Zumini additionally testified that once he got out of his car and saw his father move in his direction, he feared imminent harm. He stated that he believed "the minimum would be a knife attack," and that he could be seriously hurt or killed. He further indicated that this fear of Tony developed around July 1, 2013 and had been "ongoing" and "continuous" since that time. Zumini explained that it was because he feared for his life that he fired the first shot. Evidence of specific threats Tony made leading up to the shooting was therefore relevant to Zumini's self-defense claims, by corroborating Zumini's explanation for why he felt compelled to initiate the confrontation with Tony that night, and to support the reasonableness of his perception of an imminent threat. Such evidence was also relevant because it was material to whether Zumini acted without malice, premeditation, or deliberation. For these reasons, the trial court erred in excluding this evidence.

Our conclusion that the evidence related to Tony's prior threats should have been admitted is not intended to inhibit the trial court's gate-keeping function under the rules of evidence. As the prosecution noted in its motion to exclude evidence of Tony's prior bad acts, the defense had "provided the People a list of 51 defense witnesses, along with written summaries of statements taken from 34 of them . . . None of these witnesses saw or heard anything related to the September 6, 2013 shooting death of [Tony]. Rather, [Zumini] want[ed] to call all but a few of these witnesses purely to paint [Tony] in a negative light." The court retained the discretion to exclude evidence of prior threats if such evidence was redundant, unduly time consuming, or if the prior threat was too remote in time to the occurrence of

23

the crime. (§ 352; *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448, fn. 4 ["At some point in time . . . evidence of the victim's character becomes too remote to have any probative value and thus becomes irrelevant."]; see also *People v. Gonzales* (1967) 66 Cal.2d 482, 500 [victim's reputation for violence seven years before the crime in question was too remote to have any probative value].) Additionally, evidence of Tony's prior threats would be relevant only if Zumini was personally aware of the prior threatening behavior. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 165-166 [evidence that a person was dangerous was relevant to the defendant's claim of self-defense only if the defendant knew of the person's reputation for dangerousness]; *People v. Pena* (1984) 151 Cal.App.3d 462, 475 ["an instruction on the effect of antecedent threats known by a defendant is required where evidence establishes . . . threats . . . made by the deceased against the defendant and the defendant's belief and reliance thereon as influencing or justifying his actions"].) Notwithstanding these limitations on the scope of the admissibility of the evidence regarding the prior threats, the court was required, at a minimum, to permit Zumini to testify regarding prior threats Tony made that Zumini was personally aware of at the time he committed the shooting, and which occurred in the months preceding the shooting.[6]

---

[6] Although we conclude that the trial court erred by excluding evidence of Tony's prior threats, we are unpersuaded by Zumini's contention that these prior threats were admissible to lay a foundation for Ferry's testimony. Zumini contends that Tony's prior threats should have been admitted because such evidence was "key" to Ferry's diagnoses of Zumini. However, Ferry testified during the 402 hearing that his "working diagnoses" of Zumini were solely based on Tony's conduct during Zumini's early childhood. Thus, the court was within its discretion to limit the defense from presenting the "entire history of the relationship between [Zumini] and his father," when much of that evidence was irrelevant to the basis of Ferry's diagnoses.

24

C. *Prejudice*

Zumini contends that the exclusion of evidence related to the prior threats deprived him of his constitutional right to present a complete defense, and requires reversal under *Chapman v. California* (1967) 386 U.S. 18, 23-24 (*Chapman*), unless the error was harmless beyond a reasonable doubt. The Attorney General counters that the standard set forth by *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) is the applicable standard for determining whether such error was harmless. Under *Watson*, the judgment must be upheld unless it is reasonably probable that the defendant would have obtained a more favorable result in the absence of the error. (*Watson*, at p. 837.)

We conclude that under either standard, the trial court's error in excluding evidence of the prior threats warrants reversal. At trial, Zumini was only permitted to testify regarding a limited range of threatening behavior by the decedent. He testified that he generally feared Tony when he was a child, and that they had "disagreements" once he became an adult. Zumini also testified that he decided to confront Tony after a neighbor informed him that Tony was outside Zumini's house in the early morning on the day of the shooting. The jury also heard from Zumini that Tony was "making threats" in the summer of 2013, which made Zumini fearful for himself, the mother of his child, and his infant daughter.

However, Zumini was curtailed in his ability to present evidence about the specific nature of Tony's prior threats. As outlined by the defense in the motion in limine, there were numerous, specific incidents in the months leading up to the shooting in which Tony allegedly threatened Zumini directly. For example, Tony threatened to hurt and kill Zumini through phone calls, texts, emails, and voicemails. Tony also brandished a knife at

25

Zumini on three occasions, and drove by Zumini's house "many" times at odd hours, often with others in his car, to frighten Zumini. On two occasions, Tony initiated a high-speed car chase of Zumini, and Tony also tried to stab Zumini's car tire while Zumini was at a stoplight.

In the summer of 2013, Zumini unsuccessfully attempted to obtain a restraining order against Tony due to Tony's threatening behavior. Tony and Zumini's half-brother had threatened "to beat the shit out of [Zumini]" in early July. Zumini chased them away with baseball bats, but Tony returned about three or four more times challenging Zumini to fight, prompting Zumini to file for a restraining order. On the night before the hearing for the restraining order, Tony showed up at Zumini's house "with 2-3 carloads of people." Then, after the restraining order was denied, Tony "chased" Zumini out of the building and through the parking garage. Tony also threatened to circulate "paperwork" from the proceedings to show Zumini was a "snitch."

In addition to threatening Zumini directly, Tony also told other individuals that he was intending to harm Zumini, and Zumini was made aware of these threats. For instance, Assaad told Zumini that Tony had shown her a handgun, telling her, "This is for [Zumini], to finish him off." Tony also sent pictures of Zumini standing next to a police car, suggesting Zumini was cooperating with authorities. Zumini believed this put him in danger by "encouraging gang members to retaliate against him." Then, around July 2013, a friend of Tony's warned Zumini that Tony "was trying to have [Zumini] jumped." Lastly, within 10 days of the shooting, Tony told another friend that he was planning to shoot at Zumini and Assaad's respective homes, and these threats were conveyed to Zumini.

The trial court's decision to restrict Zumini from testifying about these prior threats prejudiced Zumini in presenting his claims to the jury. As

26

previously discussed, the court's limitations on Zumini's testimony regarding the prior threats prevented the jury from hearing evidence they were entitled to hear under the self-defense instructions they were given. Such evidence was crucial to explaining Zumini's thought process in the weeks leading up to the shooting. Specifically, it reinforces why Zumini began keeping the illegally obtained semi-automatic handgun in his car, along with knives, pepper spray, and bear spray. The excluded evidence could also provide necessary context for Zumini's decision to confront Tony at gunpoint, by explaining what he meant when he testified that his intention was to stop Tony from continuing "that type of stuff." Additionally, without hearing evidence regarding any specific threats Tony made against Zumini leading up to the date of the shooting, Zumini's testimony that he heard from a neighbor that his father parked by his house in the early morning could seem relatively insignificant. For these reasons, the excluded evidence about Tony's prior threats might have provided sufficient context to explain why Zumini felt compelled to initiate an armed confrontation with his father on the night of the shooting.

Further, the excluded evidence could have corroborated Zumini's testimony that he began shooting because he feared imminent harm. Zumini testified that although his father did not brandish any weapons or say anything to him during their final encounter, Zumini nonetheless feared he could be killed or seriously injured when his father moved in his direction. He also stated that he began to fear that a serious attack from his father was imminent in early July 2013. The jury's awareness of Tony's behavior in the months leading up to the shooting was crucial for the jury to fully understand Zumini's testimony on this point. It could have explained why Zumini feared Tony had a weapon, since Tony had brandished knives at Zumini on several

27

prior occasions. Tony had also shown Assaad a handgun, and it was Zumini's belief that Tony intended to use the gun to "finish [Zumini] off." Additionally, Tony's initiation of high-speed car chases with Zumini and stabbing Zumini's tires generally shows Tony's propensity for violence.

Overall, the trial court's decision to exclude evidence related to Tony's prior threats prevented Zumini from being able to testify as to his mental state when he committed the shooting and what led him to that mental state. The evidence of the prior threats provided essential context to Zumini's thought process leading up to Zumini's final confrontation with Tony, and could have corroborated Zumini's testimony that he perceived Tony as an imminent threat. Moreover, there is a reasonable probability that the excluded evidence could negate the mens rea required for first degree murder and support a finding of either voluntary manslaughter or second degree murder. (See *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 [heat of passion for voluntary manslaughter may arise "from a fear that did not rise to the level of fear required to establish self-defense"]; *Hernandez, supra*, 183 Cal.App.4th at p. 1332 [explaining that even if the provocation would not cause an average person to experience deadly passion as to reduce the crime to voluntary manslaughter, but precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder]; see also *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 756-757 (*Sotelo-Urena*) [reasonable probability existed that even if jury rejected defendant's self-defense claims, it might have returned a verdict of second degree murder or voluntary manslaughter rather than first degree murder based on the erroneously excluded evidence].)

The prosecution capitalized on the absence of the evidence related to Tony's prior threats during closing arguments. Without having to contend

with Tony's history of threatening Zumini, the prosecution was able to characterize Tony and Zumini's relationship as merely "up and down." The prosecution also focused on Zumini's demeanor during his testimony, suggesting Zumini's "emotionless[ness]" was odd for a person who killed his father. In addition, the prosecution highlighted to the jury that "little" about Zumini's family history had been submitted into evidence, and admonished the jurors not to speculate about such details that were not in the record.

We acknowledge that aspects of Zumini's self-defense and heat of passion claims are not compelling. Nevertheless, as the prosecution emphasized during closing arguments, very "little" was presented to the jury to explain why Zumini shot his father. This is because the trial court improperly excluded Zumini from presenting evidence regarding Tony's prior threats, evidence which was crucial to the defense. We therefore conclude that such error was not harmless beyond a reasonable doubt, and that it was also reasonably probable the error affected the verdict adversely to Zumini. (See *Padilla*, *supra*, 103 Cal.App.4th at p. 892 [improper exclusion of evidence relevant to defendant's state of mind that could have supported conviction for second degree rather than first degree murder satisfied the standard for prejudice under *Chapman* and *Watson*); see also *Minifie*, *supra*, 13 Cal.4th at p. 1070 [reasonably probable that court's erroneous exclusion of evidence of third-party threats that went to the " 'heart of' " defendant's claim of self-defense prejudiced the defendant]; *Sotelo-Urena*, *supra*, 4 Cal.App.5th at pp. 756-758 [rejecting argument that erroneous exclusion of evidence "critical" to defendant's state of mind should be analyzed for error under *Chapman*, but concluding it was reasonably probable the error was prejudicial under the *Watson* standard].)

## DISPOSITION

The judgment of conviction is reversed.

O'ROURKE, J.

I CONCUR:

HALLER, Acting P. J.

30

Do, J., Concurring.

Andrew Zumini shot and killed his father, Anthony "Tony" Zumini, Sr., on the night of September 6, 2013. Six of the shots entered Tony's back, and at least five of these wounds were fatal.

The prosecutor told the jury it was a "simple and straightforward" case of first degree murder, and that "the case [wa]s dripping with willfulness, premeditation, and deliberation." "[Zumini] had decided on this night it was going to be the night to commit the murder" of his father. Armed with a loaded gun, Zumini went "hunting" for his father, and killed him "execution-style."

The prosecutor told the jury there was nothing more to know: "*[T]here's no hidden mystery story here.*" (Italics added.) "*Things in this case are exactly what they appear to be.*" (Italics added.) And the defense's attempts to demonstrate otherwise were based on "illusion."

What the prosecutor said to the jury was not true. On the prosecution's motion, the trial court had eliminated an entire category of defense evidence that would have presented far more to the story than the jury was permitted to hear.

Zumini did not dispute he shot and killed his father, but he disputed the claim he did so deliberately and with premeditation. He asserted "he did not go to Tony's house with the intention of shooting him." Rather, he went there to confront Tony about his "relentless and escalating" threats and acts of violence against Zumini, his girlfriend Gabby Assaad and their baby A., and he "brought a gun to show he could defend himself and wasn't afraid." He further asserted "that even in the confrontation, he had no intent to shoot

1

Tony until it happened, he was in a state of extremely heightened fear, and it all happened very suddenly."

To show he did not possess the mens rea required for first degree murder, Zumini offered to prove specific threats and acts of violence committed by Tony against Zumini and his family over a long period of time, escalating during *the year and months leading up to the homicide*. These threats and acts of violence included:

- Tony made repeated threats against Zumini "to hurt and kill" him, including in phone calls, texts, emails, and voice mails.

- Tony showed Assaad a handgun and said, " 'This is for [Zumini], to finish him off.' She believed Tony was serious, and she told [Zumini] about the gun and the threat."

- Tony brandished a knife at Zumini on three occasions.

- Tony initiated confrontations with Zumini in public.

- After Zumini unsuccessfully sought a restraining order against Tony, Tony (a gang member) used the court paperwork to encourage fellow gang members to retaliate against Zumini for being a "snitch" and "collaborating with police."

- Twice, Tony "chased" Zumini and Assaad in a car at high speeds while their baby was in the car with them. On one of these occasions, Tony pursued them for an hour and a half, until Assaad called 911.

- When Zumini was in his car with Assaad and the baby at a stoplight, Tony "ran up and tried to stab" the car tire, "had his knife out in a threatening manner and was trying to get at [Assaad] and baby [A.]" Tony "was pounding on the window where the baby was with his knife."

- About a month before the homicide, Tony wrote a letter to his son Alex complaining about Zumini and stating, " 'I'm going to hammer his mouth shut once and for all.' Alex construed this as an unambiguous death threat against [Zumini]."

- Tony drove by Zumini's house "many times at odd hours to frighten him," and he "often brought several others in his car when cruising past [Zumini's] house."

2

- "About *10 days before the homicide*, Tony made a threat to . . . Rick Cordova that he would shoot at the houses where [Zumini] and [Assaad] were living. Cordova conveyed this threat to [Zumini]." (Italics added.)

Hours before the homicide, Zumini was told by a neighbor that Tony's car had been parked on his street that same day, between 1:00 and 3:00 a.m.

The defense asserted that, based on Tony's escalating violence and threats, Zumini believed "Tony had rapidly become dangerously out of control, and that there was a high likelihood that he, [Assaad], or [baby A.] would be seriously injured." It was in *this* mental state and due to *these* specific threats and acts of violence by Tony that, on the night of the homicide, Zumini went to his father's house with a gun, not to shoot him, but to confront him and put on a show of strength, the defense asserted. Zumini was in a "state of extremely heightened fear" and "had no intent to shoot Tony until it happened."

The prosecution did not dispute these specific events of violence by Tony against Zumini and his family had occurred.[1] It even sought to admit evidence of some of the same events—though in its version, Zumini was the violent antagonist—in order to prove Zumini's mental state for first degree murder.

The trial court said it had "no issue" with the prosecutor's request. But it convinced the prosecution to withdraw its motion because, although the evidence was relevant, its presentation by the prosecution would "open the door" to admission of the defense evidence for Zumini to show he had a different mental state. Then, in ruling after ruling, the court repeatedly

---

[1] The trial court also did not question these events happened, stating: "I believe they occurred."

3

deemed the specific threats and acts of violence by Tony against Zumini and his family *irrelevant* when offered by the defense.

Ultimately, the trial court precluded *every* defense fact and expert witness from testifying about any of the menacing, violent, and threatening acts that Tony committed against Zumini and those close to him. The trial court ruled that *even the defendant* could not explain his mental state by testifying, in his own words, about a single instance of Tony's specific threats and acts of violence against him and his family. Its reason: evidence of Tony's threats and acts of violence against Zumini and his family were not relevant to *any issue* at trial.

And so with Zumini as the only defense witness, and with Zumini's own testimony severely restricted, the prosecutor told the jury "to quantify" the evidence and argued: "On the defendant's side you really only have the defendant's word." "Do you trust what he told you?" The jury convicted Zumini of first degree murder.

I concur with the majority's conclusion that the trial court prejudicially erred in excluding the defense evidence, and that the jury's verdict cannot stand. But I am unable to subscribe to much of the majority opinion. I find the majority opinion's description of the trial court proceedings is distilled to the point it omits information critical to understanding and evaluating the gravity of the trial court's erroneous evidentiary rulings, and the profound effect these errors had on the defense presentation at trial. I believe the majority opinion's analysis of the trial court's errors does not adequately address all crucial issues raised in this appeal. Last, unlike the majority opinion, I would conclude the trial court's errors were of constitutional dimension and must be reviewed for harmlessness under the stricter test articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

4

*Trial Proceedings*

The majority opinion fails to provide, in my view, a sufficient account of what happened in this trial. The proffered defense evidence was the subject of numerous pretrial hearings and sidebar conferences which dominated the course of the defense presentation at trial, and ultimately generated numerous erroneous rulings. Because it is not possible to appreciate the extent to which the trial court's erroneous rulings impacted the defense presentation at trial, I provide additional details of the proceedings below.

A.      *Pretrial Motions*

1.      *Zumini's Motion in Limine*

One month before trial, Zumini filed a motion in limine in which he stated that he did not dispute shooting and killing his father. The only issue he disputed was his mental state at the time of the shooting. He would testify "he did not go to Tony's house with the intention of shooting him." Rather, he went there to "confront" Tony about his prior threats and acts of violence against him and his family, and he brought a gun "to show he could defend himself and wasn't afraid." He would testify that "even in the confrontation, he had no intent to shoot Tony until it happened, he was in a state of extremely heightened fear, and it all happened very suddenly." Zumini informed the court he intended to call "numerous" percipient witnesses to Tony's threats and acts of violence.

Zumini also sought to introduce expert testimony he contended "would assist the jury in understanding the reasons why [Zumini] would bring a gun to confront Tony if, as [Zumini] is expected to testify . . . 'he did not want a lethal confrontation with his father.' " Richard Ferry, a licensed marriage and family therapist whom the defense identified as a domestic violence

expert, had interviewed Zumini, Assaad, Zumini's mother Sally, and Zumini's brothers Alex and Anthony, and had reviewed reports of statements by eight other witnesses.

According to Ferry's report, Tony and Zumini's mother were together for the first five years of Zumini's life, during which Zumini was exposed to Tony's "extreme and relentless violence." When he was five, Zumini saw Tony physically violent with his mother on numerous occasions. Zumini grew up terrified of Tony, but he also sought his father's love and acceptance. As an 11- and 12-year-old, Zumini secretly kept in touch with Tony. Zumini described his relationship with Tony as "up and down" from 2006 to 2013. Tony would often become "angry, challenging, threatening and degrading toward [Zumini]" because Zumini refused to accompany Tony on "drug trafficking activities or gang[-]related confrontations."

Assaad and Zumini saw Tony "from time to time" when she was pregnant in 2012. After baby A. was born, Assaad did not have a place to live and, at Tony's invitation, she and the 10-month-old baby moved into his apartment in June 2013. After one week though, Tony became controlling and abusive toward Assaad and the baby. The summer of 2013 began a period of escalating violence and hostilities by Tony, including the previously described incidents.

Assaad also reported that Tony isolated and prohibited her and the baby from having contact with Zumini. He took pictures of Assaad with his other son, Raymond Lizotte (Zumini's half-brother), that suggested the two were "in an intimate relationship" and sent them to Zumini to provoke him. Tony also made Assaad "file for full custody [of the baby] in order to provoke" Zumini, and threatened he would throw her and the baby out if she did not do

6

it. He told Zumini "he would never see [baby A.] again" and "threatened to physically take [baby A.] away."

Assaad recalled an incident over July 4, 2013 when she and Tony arrived at his house to find a broken window (the July 2013 incident). Tony and Lizotte immediately went to confront Zumini at his house. Later, Tony took Assaad's cell phone and sent Zumini a text "to bait [him] into coming to his apartment because he had [Lizotte] waiting to physically assault [Zumini] when he arrived." Zumini did not respond. Other times when she was with Tony, he "physically threatened or attacked [Zumini] when he saw [Zumini] out in public." Once, Tony showed her a handgun and said, " 'This is for [Zumini], to finish him off.' " Assaad believed Tony was serious, and she told Zumini about the gun and the threat. In July 2013, Assaad took the baby and moved out of Tony's place. She and Zumini got back together. But even after Assaad moved out, Tony "stalked and intimidated" her, once grabbing her and trying to punch her at her work.

As a result of Tony's violence, Assaad stated Zumini was "extremely paranoid" of Tony. "He feared Tony . . . so much he couldn't relax or let his guard down." Zumini made Assaad carry pepper spray to protect herself and the baby, and he "always had a bat in [his] car" for his protection. "He was obsessive about her safety and the baby's safety." Assaad believed "[h]e was living in genuine fear for his safety," and that of hers and the baby's as well.

At an evidentiary hearing held on a later date, Ferry would opine that Zumini suffered from complex post-traumatic stress disorder (PTSD) and generalized anxiety disorder as a result of his violent experiences with Tony. He observed in his report that Zumini "was very scared" of Tony and "in [Zumini's] mind, the situation had rapidly become dangerously out of control, with a high likelihood that [Zumini], [Assaad] or [baby A.] would be seriously

7

injured." Zumini perceived his father as "relentless and unstoppable." Ferry opined that "[v]ictims of continuing violence . . . gradually evolve various strategies to cope . . . and to reduce the likelihood of additional violence or more severe violence." Zumini had exhibited such a coping strategy when he "attempt[ed] to discourage his father from any further aggression by demonstrating to his father that they were equally matched in their capacity to defend themselves and to inflict harm on the other if it became necessary."

The defense argued Ferry's expert testimony was admissible because it would " 'help[ ] the jury understand the situation from [the] defendant's perspective,' " to explain why Zumini "would bring a gun to confront Tony if, . . . he had no preexisting intent to use it," and thereby support the defense's effort to raise a reasonable doubt on the element of premeditation.

2.      *The Prosecution's Motions in Limine*

The prosecution filed two motions in limine relevant to this appeal. In one, the prosecution sought to admit evidence of the same July 2013 incident, but a different version, and certain aspects of Zumini's relationship with Tony. It asserted the evidence was admissible to prove Zumini had formed the intent to "shoot and kill his father two months before murdering him," under Evidence Code section 1101, subdivision (b) (the 1101(b) motion).[2] In the other motion, it sought to simultaneously preclude the defense from introducing "*any* of [Tony's] acts of prior violence" against Zumini, contending such evidence was inadmissible "[p]rior [b]ad [a]cts" under section 1103 (the 1103 motion). (Italics added.)

In the 1101(b) motion, the prosecution sought to admit evidence that a "rift" had developed between Zumini and Tony when Assaad, who was "then-

---

[2]      Unspecified statutory references are to the Evidence Code.

estranged" from Zumini, went to live with Tony in June 2013. It asserted that "[t]his embarrassed [Zumini] and caused him to become extremely angry" with his father. Zumini believed Tony "was inappropriately meddling in his personal affairs and had turned on him by taking sides with Ms. Assaad." Tony "helped Ms. Assaad file a law suit against [Zumini] to obtain full custody of their child" and Zumini "blamed" Tony for the custody dispute with Assaad. Zumini came to believe that Tony was "encouraging" Assaad "to become romantically involved with one of his other sons, Lizotte." Zumini "viewed [Tony's] behavior as outright betrayal and he wanted revenge." So he "began making hostile phone calls and sending threatening text messages to [Tony]."

The prosecution also sought to admit evidence of the July 2013 incident, in which it contended that Zumini drove by Tony's house and "threw a beer bottle that broke [Tony's] kitchen window" and "left a taunting v[oice]mail for his father." When Tony discovered the broken window and heard the voicemail, he and Lizotte went to Zumini's house "to talk to [Zumini] about it." There, Zumini and Anthony threatened Tony and Lizotte with a knife and baseball bats. When the police arrived, they saw Zumini "had his bat cocked and ready to strike" Tony. Zumini and Anthony were arrested, and Anthony was later convicted of misdemeanor assault.

The prosecution argued its proffered evidence was "highly probative" because it established Zumini had a motive to kill his father and an "intent to shoot and kill his father two months before murdering him." It argued the evidence was therefore admissible under section 1101, subdivision (b), to prove "intent, plan, and preparation."

At the same time, in the 1103 motion, the prosecution sought to preclude the defense from introducing evidence of "*any* of [Tony's] acts of

9

prior violence" against Zumini. (Italics added.) The evidence the prosecution sought to exclude included defense witness testimony about the very events the prosecution asserted were relevant and admissible in its 1101(b) motion.[3] Characterizing these specific acts of violence as Tony's "[p]rior [b]ad [a]cts," the prosecution argued such evidence was inadmissible under section 1103, as well as *People v. Hoyos* (2007) 41 Cal.4th 872 (*Hoyos*) and *People v. Gutierrez* (2009) 45 Cal.4th 789 (*Gutierrez*), among other cases.

The prosecution asserted that, although Zumini "may argue" this evidence supports his claim of imperfect self-defense, Zumini was precluded "[*a*]*s a matter of law*" from asserting the defense and obtaining a jury instruction on voluntary manslaughter. Thus any evidence of Tony's prior acts of violence was "irrelevant." (Italics added.) Relying on *Hoyos* and *Gutierrez*, the prosecution argued that for a victim's " 'propensity for violence to be relevant, there must be some evidentiary support for a self-defense-type theory.' " The prosecution further asserted that as a matter of procedure, "before a trial court even entertains allowing any of a victim's prior acts of violence into evidence, *a defendant must first establish a prima facie case of self-defense.*" (Italics added.)

Although no evidence had yet been presented—the jury would not be empaneled for another month—the prosecution argued two items of evidence foreclosed Zumini from claiming imperfect self-defense: Zumini confessed to

---

[3]     For example, the prosecution sought to exclude Anthony's testimony that on July 3, 2013, Tony "showed up at [Zumini's] house with two to three carloads of people, but no physical violence occurred." It also sought to exclude Assaad's testimony about *her* experiences with Tony during the time she lived with him in June 2013, which experiences were contrary to the prosecution's version of the events it alleged gave rise to Zumini's motive to kill Tony.

the police that he " 'went [to the Victim's house] with a gun because [he was] tired of his shit and [he was] gonna put some bullets in [the Victim.]' " And the manner of killing—Zumini shot his father "numerous times in the back" as he was running away—"necessarily means that [Zumini] did not kill him to prevent any threat of imminent harm." The prosecution argued that based on this "evidence," a defense of self-defense was unavailable to Zumini, making the defense evidence of Tony's "bad acts" irrelevant.

A note about the alleged confession: In his motion in limine, the prosecutor did not explain where the quote attributed to Zumini could be located. On appeal, the People have included the quote of Zumini's alleged confession to the police in their response brief. But they cite, as their source, the prosecutor's own *unsourced* quotation from his motion in limine. I have not been successful in my efforts to locate evidence of the confession attributed to Zumini in the record on appeal.[4] At trial, the prosecutor did not present evidence that Zumini made the alleged confession. Thus, having argued that Zumini's alleged confession was a "fact" of the case that rendered an imperfect self-defense claim unavailable to the defense and precluded

---

[4]     The defense moved in limine to suppress statements of Zumini on the grounds they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436. The defense attached two transcribed interviews to its motion, along with two police reports summarizing information obtained from Zumini. The alleged confession does not appear in these exhibits. Five exhibits were received from the prosecution during the suppression hearing, four of which were transcriptions of interviews. The People did not cause these exhibits to be transmitted to this court with the record on appeal. The trial court found there was no *Miranda* violation and denied the motion to suppress, thereby allowing the prosecution to introduce evidence of any statement of Zumini's it wished.

11

admission of the defense's evidence, the prosecution never attempted to prove that fact at trial.

### 3. *June 21, 2018 Motions in Limine Hearing*

The trial court considered the motions at a hearing on June 21, 2018. It first considered the prosecution's 1101(b) motion to introduce evidence the court labeled "euphemistically, [as] family history." The court told the prosecutor, "I have no issue, frankly, with your wanting to put those in." The court stated it was "concerned," however, that if the prosecution put in evidence of "the history of these two people" to "show [Zumini's] state of mind," it would have to permit the defense to present "another side of the story" to explain Zumini "really didn't have that state of mind." The court explained that if the prosecutor were to put "nothing in about motive," however, it would be "a clean situation" and "1103 may be in play," suggesting the defense would have greater difficulty getting its evidence in.

In response, the prosecutor withdrew his 1101(b) motion, stating, "given the choice, I would rather try this as a discrete incident." The prosecutor said his revised case-in-chief would start with Zumini's phone call to Lizotte three hours before the homicide.

Defense counsel responded Zumini was entitled to testify as to his state of mind to rebut the inference he killed deliberately and with premeditation that might arise from the circumstantial evidence. The trial court disagreed. It ruled that "*before*" the defense could "get into state of mind [evidence]" and "the history" between Zumini and Tony, "there ha[d] to be some issue of self-defense or imperfect self-defense." (Italics added.) The trial court told defense counsel that Zumini would not "be able to automatically testify as to the history of the relationship with his father" and "if [Zumini] decides to

testify, . . . *you will need to start with the circumstances as to what happened that day and work backwards.*"  (Italics added.)

    4.    *Zumini's "Memorandum of Points and Authorities re: Right to Present A Defense, Part Two: Defendant's Right to Testify Without Fetters"*

On June 25, 2018, the defense filed a brief objecting to the trial court's ruling "that Mr. Zumini's testimony would be constrained" and "limited to stating facts sufficient to warrant jury instructions on heat-of-passion voluntary manslaughter, self-defense or imperfect self-defense."  The defense specifically objected to the court's temporal restriction on Zumini's testimony, requiring him to begin with the homicide and testify "in reverse chronological order."

The defense reiterated that its evidence was being offered to rebut the inference of premeditation that would otherwise arise from the fact Zumini had a gun with him when he drove to Tony's house on the night of the homicide.  It argued Zumini's testimony would also serve to establish subjective provocation reducing the murder from first to second degree, and that the testimony of other defense witnesses was relevant because it would corroborate Zumini's account.

The defense argued the court's limitations on Zumini's testimony were unwarranted, and stood to violate his constitutional rights under the Sixth and Fourteenth Amendments.  It argued that by restricting Zumini to testifying to facts in support of specific jury instructions, the court was intruding on his right to present a defense, his related right to testify on his own behalf, and on his ability "to buttress the presumption of innocence and to strengthen reasonable doubt as to the truth of the charge."

5.      *June 25, 2018 Motion in Limine Hearing*

At a hearing on June 25, 2018, the trial court focused on the defense request for an order allowing Ferry to testify.  The court observed that Ferry's report did not include a psychological diagnosis of Zumini, and indicated the absence of a diagnosis stood to render Ferry's testimony inadmissible under *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*), because in *Cortes*, the expert had provided a psychological diagnosis of the defendant.  The court stated that if Ferry were to "get his opinion in line with" *Cortes*, Zumini would be permitted to testify about "the history of the relationship [with his father], because that would be the basis for the diagnosis by Mr. Ferry."

At this time, defense counsel reiterated that "evidence of [Tony's] course of conduct [was being] offered to prove [Zumini's] state of mind" and was admissible under section 1101, subdivision (b).  He clarified the defense was not offering evidence of Tony's prior violence "to prove his character under section 1103" and it was not "seeking to prove [Tony was] a violent man."  Rather, such evidence was being offered to specifically rebut the prosecution's "theory of the case . . . that it's a premeditated, deliberate murder" and that Zumini went to his father's house with the "preformed" intent to kill.

The trial court responded:  "I didn't hear [the prosecution's] case rest on the fact that Mr. Zumini went over there with the intention of killing his father.  [¶]  I heard [the prosecution's] case rests on the fact that . . . father did not do anything to provoke this shooting; that he was shot in the back, whatever number of times, and there was no reason for that, other than your client wanting to kill his father."  It then turned to the prosecutor and asked, "Is your argument that Mr. Zumini went there to kill his father that day?"

14

The prosecutor responded, "That's my understanding of the case[.]" The court advised the prosecutor (a second time): "[I]f the theory of the case is that Mr. Zumini went over there that day with the intention of killing his father, that could possibly open the door to the entire relationship."

6. *June 26, 2018 402 Hearing re: Ferry's Testimony*

At the section 402 evidentiary hearing the next day, Ferry testified his working diagnosis of Zumini was that he suffered from generalized anxiety disorder and complex PTSD. He explained Zumini's symptoms were not difficult to detect. The symptoms of generalized anxiety disorder suffered by Zumini included feeling: "[n]ervous, anxious, on edge much of the time," unable to control or stop worrying, and "feeling afraid, as if something awful might happen." Complex PTSD refers to the "trauma that occurs usually by a primary caretaker or a significant caretaker at developmentally vulnerable times in a person's life" and results from cumulative, repetitive interpersonal trauma.

Ferry explained that Zumini had witnessed "serious violence [by Tony] against his mother, against his brothers, against his sister," and "[h]e was occasionally the subject of [Tony's] violence" as a younger child. Tony's violence "terrorized" Zumini during the developmental ages of two to 11, the ages when complex PTSD typically develops. Ferry was "confident" both diagnoses were present in Zumini during the summer of 2013 and he was "very certain they were in play at the time of the crime." He testified that although the complex PTSD "was already established" at the time of the shooting, it is "exacerbated when [Zumini is] under stress or under what he perceives as threat by his [father]."

At the conclusion of the hearing, the trial court ruled that Ferry could testify at trial, but that his testimony would "be limited to the working

15

diagnosis and the effect that that working diagnosis and the traits associated with that working diagnosis may have had on Mr. Zumini at the time of the commission of the offense."

7. *July 16, 2018 Defense "Objection to Requiring Offer of Proof or Similar Artificial Restrictions Before Defendant Testifies to His Account"*

On July 16, 2018, the eve of trial, the defense filed a written objection in an apparent attempt to refocus the trial court on its theory of admissibility of the proffered evidence. The defense again emphasized that Zumini disputed the claim he had the mens rea for first degree murder, and he intended to testify he did not go to his father's house with the intention of shooting him. The defense argued its evidence of Tony's prior threats and acts of violence was relevant under *People v. Minifie* (1996) 13 Cal.4th 1055 (*Minifie*) and other cases, to explain and corroborate Zumini's testimony about his state of mind, and was admissible under section 1101, subdivisions (b) and (c). It argued that under *Rock v. Arkansas* (1987) 483 U.S. 44 (*Rock*), Zumini had a due process right to testify in his own defense, and that this right would be infringed if he were subjected to the requirement that he first testify to facts supporting a claim of self-defense or provocation before being permitted to testify about the events and circumstances that would allow him to explain his state of mind at the time of the homicide.

The trial court held this objection in abeyance until after Zumini took the stand, at which time it overruled it.

B. *Direct Examination of Zumini*

Zumini's direct examination took place in stages, interrupted by multiple hearings outside the presence of the jury during which the trial court considered whether Zumini's testimony about the homicide had established a prima facie case of self-defense or provocation. Unable to refer

16

to the proffered, but not-yet-admitted, evidence of Tony's threats and acts of violence against him, Zumini could only make bare assertions of his mental state at the time of the shooting.

Zumini admitted he killed his father, but testified he did not go to his father's house on September 6, 2013 with the intent to kill him.

Zumini "fear[ed] his father" when he was young, and the fear "lessened or went away" after his parents separated when he was five years old. His mother discouraged him from developing a relationship with Tony. He "kn[e]w why," but despite what he was told, he still wanted a relationship with his father.

Things were "not okay" between Zumini and Tony before 2007 "on and off." They had "disagreements," but Zumini could not say what they were about without "giv[ing] background." The disagreements left Zumini with "frustration and anger" because he did not want to do what Tony was asking him to do. Their disagreements had to "do with the law," and Zumini did not want to break the law.

Zumini and Assaad had baby A. in 2012. When Tony found out Assaad was pregnant, Tony "said he was trying to calm down" and "stop all the bullshit." Although Zumini had misgivings and thought he should "be careful" of Tony, he let Tony meet the baby at Christmas in 2012. Six months later, in June 2013, Assaad and the baby moved into Tony's apartment because Assaad needed help with rent. At first, Zumini would go to Tony's apartment every day after work to see Assaad and the baby. Zumini's relationship with Assaad became "rocky" when they started having disputes over the baby.

By early or mid-July 2013, Zumini developed a "concern . . . that [Tony] was going to start rounding up people and come up by [his] house." When

defense counsel asked whether Zumini had "received some kind of warning about that" and Zumini testified he had, the prosecutor immediately asked to approach the bench. After an unreported sidebar conference, the court excused the jury for a lunch recess.

Outside the presence of the jury, defense counsel stated he believed the court's comments to counsel at sidebar indicated that it had effectively denied the defense's July 16, 2018 written objection to the constraints imposed on Zumini's testimony. The court responded that it had not ruled on the objection and would be unable to do so until it learned "what happened on" the day of the shooting. Defense counsel then said he would resume his examination by starting with the evening of September 6 and "then backtrack."

Defense counsel asked Zumini about the items found in his car on September 6, 2013. Between July 3 and September 6, Zumini put a utility knife, a folding knife, and a used knife in either side door pockets of his car. He and Assaad bought pepper spray and, in early August, he and his brother Anthony bought a can of bear spray, both of which Zumini put in his car. In the middle of August, he got a gun. On the evening of the shooting, the gun was on the rear floorboard of the passenger side of his car.

At 5:00 p.m. on September 6, Zumini decided he would go to Tony's house with his brother Anthony. They "were going to go confront" Tony and Lizotte "so they would take . . . our threats serious and stay away from our block." Zumini explained he had "made all kinds of threats" to his father because "they were making threats and bringing people by the house." After trying unsuccessfully to call Tony, Zumini called Lizotte and Tony's wife to let them know that he and Anthony "were going to be over there later."

18

Zumini drove over to Tony's by himself; Anthony had decided not to go. It was dark outside when Zumini arrived at Tony's place. After driving by and seeing no signs that anyone was home, Zumini decided to leave. He then saw Tony and Lizotte in his driver's side mirror. Lizotte came out "throwing his arms up like in a challenging gesture, like, where the fuck you going? Come on." Zumini turned his car around and "came back towards them," driving about five to 10 miles per hour. He rolled up the passenger side window and locked the passenger side door, because Tony and Lizotte were going to be on that side of the car, and "sometimes they attack first."

As Zumini got closer to Tony and Lizotte, he could see a third person behind Tony which concerned him. Zumini then saw Lizotte "putting a glove on or wrapping his hand," which looked to Zumini like Lizotte "might be possibly getting ready to fight." Lizotte then pulled a bandana he wore around his neck over his nose. Lizotte started running alongside Zumini's car, then dealt three or four hard hits to the metal pillar separating the front and rear passenger side windows. Zumini took that to mean Lizotte "had just initiated a confrontation."

Zumini decided to stop because "[i]f [he] dr[o]ve off again, like [he] usually do[es], they [would] keep coming to [his] house." He grabbed his gun and when he got out of the car, he saw Lizotte and said to him, "[W]hat's up motherfucker? You wanna run up on me, you little bitch." As Zumini "started to clear the rear of [the] car," he saw Tony moving. Tony was between seven and nine feet away, moving in Zumini's direction, not saying anything and just "looking" at Zumini. Zumini testified he "felt that [Tony]

could have attacked." He knew "[f]or sure" that Tony had his knife,[5] and believed Tony "could have possibly had something more," including a gun. Zumini fired one shot in Tony's direction. Lizotte took off running.

Zumini "chase[d]" Tony, who ran down a breezeway, and continued to shoot while running "at full speed." He testified he was not thinking anymore after he fired the first shot, and was "just worried about stopping [Tony]." He explained that Tony "[u]sually" would "back up and then pull the knife out, or usually reach for something, or run around." Zumini testified he was concerned for his life at that time, including when he fired the first shot. He fired a second shot and Tony fell, but not "all the way." Zumini saw Tony was "still up." Zumini "kept going forward" and when he stopped running, he continued to shoot until the gun stopped firing. He had not realized he had emptied the gun.

After Tony fell to the ground and Zumini had stopped shooting, Zumini stood "somewhere between [Tony's] waist area and his feet" and saw Tony make a gesture with his hands. Zumini read the gesture to mean that Tony was "saying, don't shoot no more," that "he's gonna back off, that he's now taking the threat serious," or "he [was] gesturing that [he was] unarmed" and showing that his hands "are now empty." Zumini did not see Tony's knife on the ground.

At this point, the trial court excused the jury for the afternoon recess. Outside the presence of the jury, a lengthy hearing ensued. The court asked defense counsel, "What factually do you contend the father did to provoke your client into shooting him the number of times that he did?" The court

---

5    A folding knife, with the blade closed, was found next to Tony's body; Lizotte identified it as the knife Tony carried on his waistband "every day."

20

explained the "majority of the fatal shots . . . in the back" raised issues regarding the defense claims of provocation and self-defense. It found "[t]he record . . . devoid of information with respect to, [why Zumini] made a decision to get out of the car with a gun."

Defense counsel asserted he could not fully explain to the court, or to the jury, Zumini's state of mind at the time of the shooting, including on the issue of provocation, without the context of Zumini's relationship with Tony. The trial court stated it had "not heard anything that said [Zumini] was anything other than the person who provoked the entire situation from start to finish." It failed to see "factually where this fits into a legal theory of provocation, heat of passion." Defense counsel responded, "The reason that you can't see it is that you're only looking at ten minutes that happened on September 6th." The trial court stated, "the case law says that that's where I have to start," and that it needed to "see if the facts match up to a theory of . . . some defense, and then *we work back from there*." (Italics added.)

Defense counsel responded: It was a "battle of dominant alpha male and his beta son," and "the beta son was in a position of, I either have to show up and alpha my dad, or he's gonna beta me to the death. And I'm not exaggerating death, because the specific threats were to kill [Assaad] . . . [a]nd others were telling [Zumini] that, your dad is out to kill you. Get yourself a gun." He asserted "the reason that Mr. Zumini[ ] went over to his father's house was to stop that course of conduct." He argued the provocation "was a low simmering boil" and Zumini "was under the stress of that fear of his father, and . . . did not act as a rational person might, because he was so provoked by his father's relentless pursuit of him and his family." The court found Zumini's testimony had failed to establish provocation and self-defense "at the present time" and told the defense Zumini could not "get into the

21

family history. Defense counsel said he would "re-plow the ground" in an effort to satisfy the court.

Defense counsel resumed his examination at the moment Zumini got out of the car with a gun. Zumini testified he understood from Tony's body language and facial expression that "[t]here's not going to be any talking." Zumini did not see Tony with a knife, but he was afraid because he knew Tony carried a knife. When defense counsel then asked Zumini why he got out of the car with a gun, the trial court sustained the prosecution's objection despite its earlier statement that "why" Zumini got out of the car with a gun and ran after "the person who didn't bang on his car" was "quite probative and relevant" to provocation and self-defense.

Zumini testified that after he fired the final shots and saw Tony on the ground, he did not realize he had killed his father. Although he saw "the blood flowering on the back of [Tony's] shirt," Zumini believed that "when [Tony] goes quiet, that's when he's the most dangerous." Zumini testified he had been unable to control himself "[i]n those moments," because he was not thinking and was in "fear" of Tony.

Trial resumed the next morning and outside the presence of the jury, the court stated that Zumini's testimony still fell short of supporting jury instructions on self-defense or provocation. The court stated that Zumini had not testified "he was in imminent fear of death, . . . [rather] his father was advancing on him, and *he snapped*." (Italics added.)

Defense counsel resumed his examination. Zumini testified he had threatened Tony between 2005 and 2007, and again in late June or early July 2013. When defense counsel attempted to elicit why Zumini had made such threats, the trial court sustained a series of relevance objections by the prosecutor. Zumini was permitted to testify he was in fear on September 6,

22

2013 and he put the knives in his car at some point after he threatened Tony, but he was not permitted to explain the circumstances. After sustaining another relevance objection by the prosecutor, the trial court called both counsel to sidebar for an unreported conference. As I summarize *post*, the sidebar conference was later put on the record during Zumini's cross-examination. It was at this time that the court ruled evidence of Tony's threats and acts of violence was "not relevant" and would not be admitted.

When Zumini's testimony resumed, he testified he got off work at about 5:00 p.m. on September 6. When he got home, Zumini was told by his neighbor that she had seen Tony's car parked on their street "that same day, early in the morning" between 1:00 and 3:00 a.m. That news "elevated" Zumini's fear, and it led him to go to Tony's later that evening. Zumini carried deadly weapons in his car on September 6 because he was afraid he, Assaad, and baby A. would be "seriously hurt" by Tony. He felt that fear when he got out of the car at Tony's on the night of the shooting. He was afraid of a "knife attack or a shooting" by Tony when he saw Tony advancing toward him from seven to nine feet away. He believed a knife attack would leave him "probably . . . dead or seriously hurt," and that this would happen "instant[ly]" or "[r]eal fast." He testified that he fired the gun "based on that fear."

C.   *Cross Examination of Zumini*

Before I summarize the prosecutor's cross examination, I note my observation of another procedural irregularity.

Previously, at the June 25, 2018 hearing, the prosecutor requested the trial court allow him to cross-examine Zumini after Zumini "testifie[d] on direct as to what happened that day" of the shooting but "*before* the [c]ourt rules on the admissibility" of the specific instances of Tony's violence. (Italics

23

added.)  The prosecutor argued:  "What if Mr. Zumini testifies on direct, as [defense counsel] has indicated that he will, that he went over to the house that day with no intention, whatsoever, of shooting his father.  [¶] . . . [¶]  My position is that *I should be allowed to have the opportunity to cross-examine and ask him* [before the court rules on the admissibility of Tony's acts of violence]*, isn't it true you told the police that you went over there with the specific intent to put some bullet holes in your father that day*?"  (Italics added.)

The trial court agreed, "Yes.  I think that is appropriate.  I do." However, the trial court advised the prosecutor (now a third time):  "I don't mean to be a fly in the ointment . . . if the theory of the case is that Mr. Zumini went over there that day with the intention of killing his father, that could possibly open the door to the entire relationship."  (Italics added.)

Thus, the prosecutor was permitted to cross examine Zumini on his mental state at the time of the shooting, *before* the trial court ruled whether Zumini could testify about Tony's prior threats and acts of violence to explain that mental state.  But, contrary to the scenario he presented as justification for the unusual request, the prosecutor never confronted Zumini with any alleged confession of premeditation or intent to kill.

Under cross-examination, Zumini testified he bought the gun in mid-August 2013 "off of the streets," but not for the purpose of killing his father. He paid more than retail for the gun because he wanted the gun "immediate[ly]," not because it would be untraceable.  He did not choose the handgun for any of its features, but because it was "the gun that was available at the time."  The hollow point bullets "came with the gun"; he did not request them and did not learn until after his arrest that hollow point

24

bullets inflict greater damage. Zumini testified he did not have any knowledge of guns, had never fired a gun and had not practiced using a gun.

After his neighbor told him she saw Tony "parked outside of her house" in the early morning hours of September 6, Zumini called Lizotte around 6:30 p.m. to tell Lizotte he was coming over. He left for Tony's place around 9:30 p.m. and went there "looking for him to talk to him." "[He] wanted to show [Tony] [he] was capable of showing up to his house with a gun." The prosecutor asked Zumini if he was "going to essentially threaten to kill [Tony] at that time" with the gun. Zumini testified he intended to "display" the gun to Tony, not shoot him. Indeed, Zumini had shown that gun to Tony before. (On redirect, Zumini explained he had shown Tony the gun on August 23 or 24, 2013 when Tony came onto his street in order to demonstrate to Tony that he was armed to protect himself.)

The prosecutor questioned why Zumini did not unload the gun or why he took "a second clip full of hollow point bullets" if his intention was only to show the gun, not shoot Tony. Zumini responded that Tony was "unpredictable" and "[i]t could possibly get out of hand." He agreed the gun was on the rear passenger floorboard and the second clip was in the door "map pocket" for quick access.

Zumini agreed he made the decision to stop the car and get out with the gun after Lizotte hit the window. When Zumini got out of the car, Tony did not say anything to him and he did not see any weapons in Tony's hands. Zumini agreed he made a decision in "[t]he initial shot" to shoot Tony, but after that, he "wasn't making decisions" but "was just doing." He fired two shots from the driveway, a third shot as he chased Tony down the breezeway, and that's when Tony started to go to the ground. Zumini testified "[i]t happened real quick" and he "was moving real fast."

25

When Tony "went to the ground," "[h]is upper body was still up and his head was up. He wasn't down." Zumini testified, "I knew he was shot. I didn't know that he was disabled." The prosecutor asked, "So if you fire six rounds into someone's back, pretty good chance that the person is gonna die; right?" Zumini responded, "Someone. Not my dad." Zumini denied he was "standing right over [his] father shooting him in the back."

Zumini agreed that before he fired the third shot, he was trying "to kill" "disable" or "stop" Tony at that time. He testified: "After the first shot I was just going. . . . [¶] When [Tony] came forward I assessed, by the body language, the quietness, that there was gonna be no talking. And usually that means reaching for the knife or grabbing the knife. Once I assessed that for like a split second, I [just] went. I was just going. To whether it was to kill or to disable, I can't even explain myself to this day because I was just going. [¶] . . . [¶] I wasn't making decisions. I was just doing."

After the shooting, Zumini drove from San Jose to Fremont and hid the gun and the magazines in two different storm drains. He testified he hid the evidence because he "panicked." At a different location, he got rid of his clothes in a dumpster and changed into a pair of sweatpants and hooded sweatshirt he usually kept in his car.

At a break in cross-examination, the trial court put on the record the earlier unreported sidebar conference in which it ruled evidence of Tony's prior threats and acts of violence against Zumini was "not relevant" and would not be admitted. The court explained: "That the prior history at this time, given the lack of provocation, the bereft nature of the record with respect to the decedent's provocation on the date in question, makes the issue of their prior history not relevant." The trial court also ruled that Ferry would be permitted to offer the opinion that "Zumini suffers from PTSD, and

26

that could have altered how he viewed the situation or the threat that he believed was present on the date of the incident, September 6th," but he was prohibited from testifying to "the entire history of the relationship" between Zumini and Tony. The court likened the permissible scope of Ferry's testimony to that of a child sexual abuse accommodation syndrome expert.

Based on the trial court's rulings, the defense elected not to call Ferry. It explained his testimony would be "vitiated" if the jury was not permitted to hear the basis of his opinions and, with Ferry's testimony "lessened," the defense also did not want to end its case with a potential "battle of the experts." The defense also opted not to call nine character witnesses who would have testified to Zumini's character for honesty and peacefulness. Defense counsel explained that the prosecutor intended to cross examine them about specific instances of Zumini's violent acts, and without the ability to contextualize Zumini's acts within the overarching conflict with his father, defense counsel would be unable to respond. Thus, the defense rested its case with Zumini as its only witness.

## II.

### *The Trial Court Repeatedly Erred in Its in Limine Rulings*

The trial court made a series of errors in ruling on the parties' motions in limine, the effect of which was then profoundly felt during all stages of the defense presentation at trial. I identify the errors as they occurred.

*First* and foremost, the trial court persistently ignored the defense's central theory of admissibility of its evidence of Tony's threats and acts of violence. The defense specifically, and repeatedly, stated that it would rely on its evidence to raise a reasonable doubt whether Zumini killed deliberately and with premeditation. The defense evidence was plainly relevant and admissible for this purpose. I discuss this in more detail below.

27

*Second*, the trial court erred when it persuaded the prosecution to withdraw its 1101(b) motion on the ground this would eliminate a theory of admissibility otherwise available to the defense. The court's rationale strongly suggested it was not acting as a neutral decisionmaker, and its reasoning was incorrect. By withdrawing its motion, the prosecution eliminated certain facts from its case, but it continued to assert the fact that Zumini had a gun with him when he drove to Tony's house showed he was planning to shoot Tony. This was the very inference of premeditation the defense said it was seeking to rebut. Thus, the withdrawal of the prosecution's motion did not close a door or render the defense evidence irrelevant. (See *People v. Marsh* (1962) 58 Cal.2d 732, 736 (*Marsh*) ["It is elementary that if the prosecution can introduce evidence of a required specific intent, the defendant must be given the equal privilege of showing the lack of such intent."].)

*Third*, the trial court erred when it adopted the prosecution's position that the defense evidence of Tony's so-called "prior bad acts" was character evidence offered to show Tony's propensity for violence, and that to be admissible for this purpose, the defense would first have to establish *a prima facie case* of a " 'self-defense-type theory.' " This ruling was erroneous, and its effect on the defense case was particularly devastating.

To begin with, the defense evidence of Tony's threats and acts of violence was not inadmissible character evidence. Section 1101, subdivision (a), "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence

28

is relevant to establish some fact other than the person's character or disposition" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393), "such as motive, opportunity, *intent, preparation, [or] plan*" (§ 1101, subd. (b), italics added), or the lack thereof. Subdivision (c) of section 1101 further provides this rule also does not "affect[ ] the admissibility of evidence offered to support or attack the credibility of a witness." Finally, section 1103, subdivision (a), carves out yet another exception to this rule: evidence of the *victim's character* is not inadmissible when "[o]ffered by the defendant to prove conduct of the victim in conformity with [that] character."

Here, the defense specified many times that it was relying on its evidence to prove Zumini's state of mind, *not* Tony's bad character or intentions. (See *Minifie, supra*, 13 Cal.4th at p. 1067 [evidence " 'offered to explain [defendant's] state of mind, rather than to prove [the victim's] actual intentions' " is not character evidence]; see *People v. Davis* (1965) 63 Cal.2d 648, 656 (*Davis*) [defendant sought to present evidence of deceased's knife attacks "which defendant had witnessed or which had been reported to him," and "was not attempting to prove deceased's character" but "to prove his own frame of mind"].) The defense evidence was therefore admissible under section 1101, subdivision (b) to prove Zumini's lack of intent, preparation or planning, and under section 1101, subdivision (c), to support the credibility of Zumini's testimony about such facts. And although it was not offered as evidence of Tony's propensity for violence, section 1103 would not have barred the defense from presenting its evidence even for that purpose.

29

Moreover, contrary to the prosecutor's arguments, *Gutierrez* and *Hoyos*, on which the prosecution relied, were not controlling.[6]  In both *Gutierrez* and *Hoyos*, the victim's prior conduct *did not involve the defendant and was not alleged to have been known to the defendant*.  (See *Gutierrez, supra*, 45 Cal.4th at pp. 827–828 [victim's prior misdemeanor battery conviction, "an event entirely unrelated to defendant," offered to show the defendant "was engaged in mutual combat with the victim"]; *Hoyos, supra*, 41 Cal.4th at pp. 912–913 [evidence of victim's propensity for violence and use of firearms was based on statements a third-party witness made to police that the victim has such a propensity and "might have been going for a gun" at the time of the homicide].)  In both *Gutierrez* and *Hoyos*, the defense argued the evidence would prove the victim had a violent character and was acting in conformity with that character during the struggle that resulted in her death.  (*Gutierrez*, at pp. 827–828; *Hoyos*, at pp. 912–913.)  Here, unlike *Gutierrez* and *Hoyos*, the victim's prior threats and acts of violence had been personally directed at the defendant, and the evidence was not offered to prove the victim acted in conformity with his prior conduct.  For these reasons, *Gutierrez* and *Hoyos* were inapposite.  (*People v. Thomas* (2021) 64 Cal.App.5th 924, 945, fn. 6 [" 'Cases are not authority for propositions not considered.' "].)

---

[6]    The prosecutor also relied on *People v. Soules* (1940) 41 Cal.App.2d 298.  In *Soules*, unlike this case, the victim "had made no previous threats or demonstrations against the defendant."  (*Id.* at p. 304.)  Also, the *Soules* court relied, in part, on the strength of the prosecution's case in deciding the defense evidence of the victim's specific acts of violence was properly excluded.  (*Id.* at pp. 310–311.)  As Zumini points out in his opening brief on appeal, this mode of analysis was held unconstitutional in *Holmes v. South Carolina* (2006) 547 U.S. 319, 330–331 (*Holmes*).  In their responsive brief, the People do not rely on *Soules*.

30

Further, neither *Gutierrez* nor *Hoyos* stood for the remarkable proposition the trial court drew from them:  that the court could not rule on the relevance and admissibility of Tony's threats and acts of violence until the defense first presented trial evidence sufficient to establish a prima facie case of self-defense or provocation.  The court's view that it was required to adopt this "backwards" approach seems to have resulted from its mistaken belief that the retrospective reasoning employed by the California Supreme Court when it reviews a judgment could or should be put into practice prospectively by a trial court.[7]

*Fourth*, having decided the defense would have to present evidence of a "prima facie case" of self-defense or provocation *before* it would be allowed to present evidence of Tony's threats and acts of violence, the trial court added another restriction:  it ruled the prima facie case would have to be established based on events from the day of the homicide.  This temporal limitation appears to have arisen from the court's belief that a defendant cannot claim to have killed under provocation if there was a cooling-off period of more than one day.  The court was incorrect on this point as well.  The rule is that provocation may occur over a "considerable period of time."  (*People v. Wharton* (1991) 53 Cal.3d 522, 571 (*Wharton*) [provocation occurred over a period of weeks during which the defendant and his girlfriend had been arguing, culminating in an incident in which she threw a book at him and he, in a rage, hit her head with a hammer].)  Further, the "provocatory course of

---

[7]     When the trial court receives an objection to the admissibility of evidence, the usual practice is to rule based on offers of proof.  (See, e.g., *People v. Schmies* (1996) 44 Cal.App.4th 38, 53 [explaining the offer of proof procedure].)  A trial court can also admit evidence conditionally, subject to later evidence establishing any missing foundational facts.  (§ 403, subd. (b); see *People v. Simon* (1986) 184 Cal.App.3d 125, 130–131.)

31

conduct theory of heat of passion/provocation" does not always "require[ ] the existence of some instigative final act, however trivial, before it is worthy of consideration by the jury." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1489 (*Wright*).) The adequacy of an alleged cooling-off period is also a question of fact for the jury. (*Id.* at p. 1490.)

The court then added to the scope of its restrictions by subjecting the *defendant's own testimony* to this prima facie case requirement, telling defense counsel, "if your client decides to testify, . . . you will need to start with the circumstances as to what happened that day and work backwards." No authority cited by the prosecution supported the trial court in imposing this degree of control over the defendant's testimony.

The trial court then raised the bar even higher when it granted the prosecutor's request—a request for which the prosecutor offered no supporting authority—and ruled that he would be permitted to cross examine Zumini on his mental state at the time of the shooting, out of order, before the court ruled on the admissibility of the remainder of Zumini's testimony as to the very events that led to his mental state.

*Fifth*, once the trial court determined that Ferry would be permitted to testify that Zumini suffered from complex PTSD and generalized anxiety disorder at the time of the offense, it should have allowed Ferry to testify about Tony's history of abuse and violence to the extent he relied on that history for his opinions. "Since an expert's opinion ' "is no better than the facts on which it is based" ' [citation], experts should generally be allowed to testify to all facts upon which they base their opinions [citation]." (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1324–1325; see *Cortes*, *supra*, 192 Cal.App.4th at p. 910 [trial court erroneously precluded defense psychiatric expert from testifying about "defendant's upbringing and traumatic

32

experiences . . . , inasmuch as defendant's prior traumatic experiences informed [the expert's] opinion, and explained the connection between defendant's diagnoses, his mental state and his behavior"].)  The defense should also have been permitted to present direct evidence of the foundational facts relied on by Ferry through its fact witnesses.  (See *People v. Sanchez* (2016) 63 Cal.4th 665, 676 (*Sanchez*).)

*Sixth*, by holding in abeyance the defense eve-of-trial objection to imposing arbitrary restrictions on Zumini's own testimony, the trial court lost an opportunity to correct its misguided course and avoid constitutional error.  The cumulative effect of the court's erroneous in limine rulings crippled the defense presentation at trial.  Defense counsel was relegated to giving an opening statement that presented a narrative account of Zumini's thoughts and feelings, as though they existed in the abstract, untethered to any real-world events.  When the court overruled the defense objection to the arbitrary constraints on Zumini's testimony, defense counsel had to reorder his direct examination and question Zumini "backwards," beginning with the day of the homicide.  Zumini, restricted from testifying about the things Tony had done to him, could only offer bare assertions about his mental state, and was unable to explain why he decided to confront Tony, what the confrontation was about, why he was armed if he was not intending to shoot Tony, why he was so scared of a knife assault from Tony, or why he perceived Tony's behavior as he did.

*Seventh*, although the trial court claimed it would allow Zumini to testify about Tony's threats and acts of violence once it heard testimony substantiating a prima facie claim of self-defense or provocation, it seemed to ignore testimony given for this very purpose.  Each time the trial court identified what it believed were deficiencies in Zumini's testimony, defense

counsel elicited testimony that overcame them. By the time Zumini finished testifying, it was apparent the defense had, in fact, substantiated "a prima facie case" of provocation, as well as self-defense. And yet the trial court ruled otherwise and excluded the defense evidence altogether.

The trial court ruled the evidence of Tony's threats and acts of violence irrelevant to prove provocation out of two concerns, both misguided. First, it reasoned that any provocation had to occur on the day of the homicide. As discussed above, this was incorrect. (*Wharton*, *supra*, 53 Cal.3d at p. 571 [provocation can occur over a "considerable period of time"]; *Wright*, *supra*, 242 Cal.App.4th at p. 1490 [adequacy of cooling-off period is an issue for the jury].) Second, it determined that Tony's behavior on the day of the homicide was not provocative. The defense argued that Zumini knew Tony to always carry a knife, and that Tony's act of advancing on him—with body language and facial expression Zumini understood to mean an assault was imminent—sent Zumini into a state of uncontrolled fear. Zumini's own testimony that he subjectively feared Tony in that moment was sufficient to substantiate a claim of subjective provocation reducing the degree of murder. Whether this behavior was objectively provocative, so as to support a theory of heat-of-passion voluntary manslaughter, was an issue the jury should have been permitted to decide. It should also have been allowed to decide this issue with the benefit of the evidence of Tony's prior threats and acts of violence so it could understand why Zumini perceived Tony as he did.

In sum, the trial court missed every opportunity to recognize the relevance of the evidence of Tony's threats and acts of violence. The evidence was relevant to every theory identified by the defense. It was relevant to negate the prosecution's theory of a premeditated murder, and thereby create a reasonable doubt in the minds of jurors whether Zumini acted with the

34

mens rea required for first degree murder. I write further about this issue because it is critical that the trial court understand that this theory of admissibility was available to the defense. The evidence was also relevant to support Zumini's claims of provocation and self-defense. I agree with the majority on this point but write further to explain my concerns with the majority's analysis of the errors in the court's rulings on self-defense.

III.

*The Defense Evidence Was Relevant and Admissible to Raise a Reasonable Doubt Whether Zumini Killed Deliberately and with Premeditation*

The majority opinion concludes the defense evidence was relevant to Zumini's claim he did not commit the shooting with the mens rea required for first degree murder, and it was error for the trial court to exclude it. (Maj. opn., p. 14.) I agree. The majority opinion, however, dispatches with the issue in merely two sentences, and devotes very little attention to analyzing the error. (Maj. opn., p. 14 [the defense evidence "was material to his claim that he did not commit the shooting with the mens rea required for first degree murder"] and p. 23 ["[s]uch evidence was also relevant because it was material to whether Zumini acted without malice, premeditation, or deliberation"].) It was the defense's central theory of admissibility that its evidence was relevant to raise a reasonable doubt whether Zumini killed deliberately and with premeditation. The trial court's repeated failure to recognize the viability of this basic defense theory was, in my view, its core error.

The prosecution has the burden of proving beyond a reasonable doubt that a killing was the result of premeditation and deliberation, and is therefore murder of the first degree. (*People v. Anderson* (1968) 70 Cal.2d 15, 25 (*Anderson*).) Proof of a specific intent to kill alone does not establish first

degree murder. (*Id.* at p. 26 ["[T]he legislative classification of murder into two degrees would be meaningless if 'deliberation' and 'premeditation' were construed as requiring no more reflection than may be involved in the mere formation of a specific intent to kill."]; accord *People v. Thomas* (1945) 25 Cal.2d 880, 898.) The "brutality of a killing cannot [also] in itself support a finding that the killer acted with premeditation and deliberation." (*Anderson*, at pp. 24–25.) Rather, the prosecution must prove the intent to kill was " 'the result of deliberate premeditation . . . formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.' " (*Thomas*, at p. 900.) A killing that is "the result of mere unconsidered or rash impulse hastily executed" is not murder of the first degree. (*Id.* at pp. 900–901.)

When, as in this case, a defendant stands accused of first degree murder for a killing he does not dispute having committed, he may attempt to reduce the murder from first degree to second degree by raising a reasonable doubt that the killing was willful, premeditated, and deliberated. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1214–1215 (*Gonzalez*).) The right of the accused to hold the prosecution to its burden of proving his guilt beyond a reasonable doubt is a cornerstone of our criminal justice system. (*In re Winship* (1970) 397 U.S. 358, 364 [" 'Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt.' "].) Thus, a criminal defendant is entitled as a matter of due process to hold the prosecution to its burden of proof by presenting otherwise competent evidence that " 'raises' or permits a reasonable doubt that he is guilty as charged." (*Gonzalez*, at p. 1215.) This well-settled constitutional principle "applies to the whole and every material part of [a homicide] case, no matter whether it is as to the act of killing, or

the reason for or manner of its commission." (*People v. Bushton* (1889) 80 Cal. 160, 164.)

Here, the prosecution sought to prove Zumini committed murder of the first degree. From the inception of its case, the prosecution claimed Zumini had formed the intent "to shoot and kill his father two months before murdering him." It pointed to the fact that Zumini brought a gun with him when he drove to Tony's place on the night of the homicide as evidence he was planning to kill Tony. The prosecutor then explicitly argued that the jury should draw this inference, but even if the prosecutor had not, the jury could have drawn this inference on its own. (*Anderson*, *supra*, 70 Cal.2d at pp. 26–27 [evidence of planning activity may support the finding that a murder was deliberate and premeditated].) And the defendant would be entitled to respond to that inference of premeditation.

The defense conceded Zumini shot and killed his father, and disputed only whether Zumini killed deliberately and with premeditation. The defense specifically stated Zumini would testify "he did not go to Tony's house with the intention of shooting him," but rather to "confront" Tony about his prior threats and acts of violence against him and his family, and he brought a gun "to show he could defend himself and wasn't afraid." Throughout the proceedings, the defense explained its evidence was being offered to rebut the inference of premeditation that would otherwise arise from the fact Zumini had a gun with him when he drove to Tony's house on the night of the homicide.

Unquestionably, the defense had a right to present its evidence for this purpose. "[I]t is fundamental that at the trial upon a not guilty plea evidence, competent in character, which tends to show that a defendant, at the time he committed the overt act, either possessed or did not possess the

37

specific essential mental state (as of malice aforethought, deliberate intent, etc.) is admissible." (*People v. Wells* (1949) 33 Cal.2d 330, 347.)  Therefore, "a defendant may present evidence to show that he or she lacked the mental state required to commit the charged crime." (*People v. Hernandez* (2000) 22 Cal.4th 512, 520; see *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083–1089 (*Humphrey*); *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744–756; *Cortes*, *supra*, 192 Cal.App.4th at p. 908.)

Once the prosecution presents evidence in support of the charged crime, the defendant has the fundamental right to present evidence to dispute the accuracy of the prosecution's claims.  *This right exists whether or not the defense evidence happens to support a particular recognized defense.* "[W]hen there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People, *the accused need only raise a reasonable doubt* as to the existence or nonexistence of the fact in issue." (*People v. Tewksbury* (1976) 15 Cal.3d 953, 963, italics added.)  When the defendant presents evidence of *a factual theory* that tends to negate the elements of the offense, he "has *no* burden of *proof* or *persuasion,* even as to his defenses." (*Gonzalez*, *supra*, 51 Cal.3d at pp. 1214–1215.)

Evidence is relevant if it tends to prove or disprove a disputed fact "of consequence to the determination of the action," or if it is relevant to a witness's credibility. (§ 210.)  Here, Zumini's mental state at the time he drove to Tony's, and whether that mental state was one of premeditation, was at issue.  Indeed, this trial was only about Zumini's mental state.  Thus, the trial court, in determining whether the defense evidence was relevant, needed to consider only whether the evidence tended to disprove the

38

inference of premeditation that arose from Zumini's act of bringing a gun with him to the location of the homicide.

Plainly, it did. The escalating series of physical attacks and threats Tony committed against Zumini and his loved ones in the year and months leading up to the homicide tended to explain why Zumini bought a gun and why he had outfitted his car with weapons. This evidence also tended to explain and corroborate Zumini's claim that despite the gun, his actual intent when he drove to Tony's was to confront Tony, not shoot him. At the same time, evidence of Zumini's history with Tony, and his longing for a relationship despite Tony's repeated abuse, tended to support Zumini's assertion that his actual reason for driving to Tony's with a gun was to confront and intimidate Tony, and convince him to back down, rather than to kill him.

The defense evidence, and the purpose for which it was offered, was strikingly similar to evidence that our high court held was erroneously excluded in *People v. Lee Chuck* (1887) 74 Cal. 30, 34–35 (*Lee Chuck*) (discussed in *Minifie, supra,* 13 Cal.4th at pp. 1066–1067.) Lee Chuck was convicted of murder after shooting Yin Yuen. (*Lee Chuck*, at p. 30.) "It appeared from the evidence of the prosecution that, at the time of the homicide, Lee Chuck was encased in a steel coat-of-mail, and was armed with four pistols." (*Id.* at p. 34.) This evidence was "intended to have, and doubtless did have, great weight in convincing the jury that Lee Chuck had prepared himself for the deadly encounter in which Yin Yuen lost his life. To explain this fact, and to show that the defendant had reason to think his life in danger, and for that reason, and not to prepare himself to make a murderous assault upon the deceased, defendant put on a coat-of-mail and armed himself, the defense offered to show that the Bo Sin Sear Society and

39

another organization, of which Yin Yuen was a member, had threatened to take the life of defendant, and that defendant had been informed of the fact. This evidence was objected to as incompetent, and the objection was sustained." (*Ibid.*)

The California Supreme Court reversed: "This ruling cannot be maintained. The fact of the extraordinary armor worn by the defendant at the time of the homicide was important evidence for the prosecution. *To refuse to permit the defendant to show that the preparation was for a different purpose, and for reasons which implied no intent to assault the deceased, was a denial of a most essential right.*" (*Lee Chuck, supra*, 74 Cal. at p. 35, italics added.)

Here, as in *Lee Chuck*, evidence of Tony's threats and acts of violence tended to explain Zumini's defensive reasons for arming himself and to refute the prosecution's claim that Zumini was planning on murdering Tony. The defense was nevertheless precluded from showing that it was in response to Tony's relentless aggressions that Zumini outfitted his car with weapons, that he had acquired the gun after learning of Tony's death threats, and that his actual plan on the night of the homicide was to intimidate Tony with his own show of strength, because he believed this was the only way to convince Tony to put an end to the ongoing hostilities. As in *Lee Chuck*, precluding Zumini from presenting this evidence "was a denial of a most essential right." (*Lee Chuck, supra*, 74 Cal. at p. 35.)

Moreover, as numerous authorities establish, the defendant's right to present a defense is not limited to merely asserting on the witness stand that he did not act with the mental state claimed by the prosecution. He also has the right to persuade the jury of the credibility of his account *by testifying to facts that allow him to explain himself*, so the jury can make sense of his

40

testimony and understand his claims about his less culpable mental state, as well as to present competent, reliable evidence *from other sources* tending to corroborate his version of events. (*Crane v. Kentucky* (1986) 476 U.S. 683, 688–690 (*Crane*) ["[S]tripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?"]; *Davis*, *supra*, 63 Cal.2d at p. 657 ["Defendant was entitled to bolster his claims by corroborating testimony in his attempt to influence the jurors to a more favorable finding."]; *Minifie*, *supra*, 13 Cal.4th at p. 1066 ["A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence 'tend[ing] in reason to prove' that the fear was reasonable."]; *Humphrey*, *supra*, 13 Cal.4th at p. 1083 [" '[A] defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind[.]' "]; accord *People v. Smith* (1907) 151 Cal. 619, 628; § 210 [" '[r]elevant evidence' " includes "evidence relevant to the credibility of a witness"].)

In sum, the trial court failed to perceive that the defense evidence was relevant and admissible for the simple but fundamental reason that it tended to create a reasonable doubt whether Zumini acted with the mental state required for first degree murder. It appears to me that the majority opinion has overlooked this as well. In explaining the general legal principles, the majority opinion states only that "[p]remeditation and deliberation may be negated by heat of passion arising from provocation." (Maj. opn., p. 15.) It leaves out entirely any discussion of the prosecution's burden to prove beyond a reasonable doubt every element of the crime charged. And there is no acknowledgment of the defendant's fundamental right to present competent

41

evidence to raise a reasonable doubt that he is guilty as charged. (*Gonzalez*, *supra*, 51 Cal.3d at pp. 1214–1215.) The risk of not providing the trial court with a full analysis of this critical error is that it may be repeated.

IV.

*The Defense Evidence Was Relevant and Admissible to Support Self-Defense*

I agree with the majority's conclusion the defense evidence was relevant and admissible to support Zumini's self-defense claims. (Maj. opn., pp. 22–23.) The trial court plainly erred in excluding the evidence and, in my view, compounded that error with the numerous unjustified procedural conditions it imposed on the defense. (See section II, *ante* [requiring the defense to establish a "prima facie case" of self-defense or provocation before ruling on admissibility of the evidence and requiring the defendant to testify "backwards" under strict temporal limitations].) I part with the majority opinion, however, in its reasoning as to how the error occurred.

Rather than simply explain why the excluded evidence had a tendency in reason to prove that Zumini acted in perfect or imperfect self-defense, the majority opinion focuses first, and primarily, on the trial court's decision to give self-defense instructions. (Maj. opn., pp. 13–14, 19, 20.) And it does so in such a way as to strongly suggest that, for the majority, the trial court's true error was in the giving of self-defense instructions, not the exclusion of the evidence in the first instance. This analysis is untenable.

According to the majority opinion, the trial court "elected" to give self-defense instructions despite concluding that Zumini's "own testimony established that he did not fear imminent death or great bodily injury when he committed the shooting" (maj. opn., pp. 18, 20) and that there was, therefore, "not a scintilla of evidence to show Zumini had acted in self-

42

defense" (maj. opn., p. 19).[8] The majority opinion reasons that "by instructing the jury on self-defense, the [trial] court *impliedly* found that there *was* substantial evidence in the record to support Zumini's self-defense claims" (maj. opn., p. 19, italics added), and "[s]uch [a] ruling is plainly inconsistent with the court's earlier evidentiary ruling, [that] . . . there was not a scintilla of evidence to show Zumini had acted in self-defense" (maj. opn., p. 19). The majority opinion then concludes: "*Once* the [trial] court elected to instruct the jury on self-defense, *the explicit terms of the self-defense instructions made Tony's prior threatening behavior relevant*, and thus such evidence should have been admitted." (Maj. opn., p. 14, italics added.) "It was therefore *an abuse of discretion for the court to instruct the jury* to consider Tony's prior threats, while at the same time excluding evidence of the prior threats as irrelevant." (Maj. opn., p. 21, italics added.) This is illogical.

To be clear, a trial court's decision to give an instruction may *illuminate and reveal the prejudice* that flows from erroneously excluding evidence relevant to that instruction. But it cannot create the evidentiary error, as the majority opinion seems to suggest. For example, in *Marsh*,

---

[8]    The majority opinion states that the trial court found there was not a "scintilla of evidence to show Zumini had acted in self-defense." (Maj. opn., p. 19.) The majority opinion's assertion that the court made such a finding appears to be based on a comment the court made during a break in Zumini's direct examination testimony. It stated: "[T]he [c]ourt has a sua sponte duty to give self-defense, frankly, if even a *scintilla* of evidence is present with respect to a self-defense theory." (Italics added.) The court was merely conveying its understanding (although incorrect) of the standard governing its duty to instruct on self-defense; it was not making a finding about the overall quantum of proof of self-defense generated by Zumini's testimony. Indeed, Zumini had not finished testifying when the court made this comment.

43

*supra*, 58 Cal.2d at pages 735, 736–737, the defendants were charged with theft crimes in the form of obtaining money by false representations based on their sale of medical devices that delivered no actual medical benefit. The California Supreme Court reviewed the trial court's decision to exclude on hearsay grounds documents the defendants claimed they had relied on to form their belief that the medical devices actually worked to disprove any specific intent to defraud. (*Id.* at pp. 736–737.) The Court first concluded the trial court erred in excluding the documents on the grounds their contents were hearsay, because the documents were not offered for a hearsay purpose. (*Id.* at p. 740.) *Then*, the Court analyzed the prejudice that flowed from the erroneous exclusion of the evidence, stating that: "This *error was emphasized* because the instructions given by the trial court correctly told the jury that defendants' defense was a good faith belief in the curative powers of the machines, but the rulings on the admissibility of evidence prevented the introduction of the very evidence defendants relied on to support their contention of good faith belief." (*Ibid.*, italics added.)

Here, the majority opinion does something quite different. Rather than analyze the trial court's ruling on the relevance and admissibility of the defense evidence first, as our high court did in *Marsh*, the majority opinion flips the analysis and focuses *first* on the trial court's decision to instruct the jury on self-defense. In doing so, the majority opinion suggests the evidence was relevant "[o]nce" the trial court "elected" to instruct the jury on self-defense, and that it was "the explicit terms of [those] instructions [that] made Tony's prior threatening behavior relevant." (Maj. opn., pp. 14, 20.) I disagree. As in *Marsh*, the trial court's subsequent decision to give the self-defense instructions only "emphasized" its obvious error in excluding the

44

evidence as irrelevant in the first instance. (*Marsh, supra,* 58 Cal. 2d at p. 740.)

The majority opinion's reasoning is troubling for another reason. It seems to suggest it agrees with the People's argument on appeal that there was no evidentiary error because "the trial court erred in instructing the jury on [perfect or imperfect self-defense] theories." The majority opinion's repeated use of the words "electing," "elected" and "election" when referring to the trial court's instruction decision (maj. opn., pp. 13, 14, 19, 20) conveys its view that, on this record, the trial court's decision to instruct on self-defense was discretionary. Not so.

To the contrary, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) A review of this record reveals the trial court repeatedly ignored evidence favorable to the defense, and that there was, in fact, substantial evidence to support giving these instructions. " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Ibid.*)

Zumini's testimony was substantial evidence to support the giving of self-defense instructions. "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person

completely, the belief must also be objectively reasonable." (*Humphrey, supra,* 13 Cal.4th at p. 1082.) "Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm." (*Ibid.*)

Here, Zumini testified that he shot Tony in the belief Tony was about to attack him "[f]or sure" with a knife, and possibly with a firearm; that he continued to shoot because he continued to perceive Tony as a threat; and that he did not perceive an end to the danger even as Tony lay on the ground. The jury was entitled to consider, based on this testimony, whether Zumini acted under an actual belief in the need to defend against imminent harm from Tony, and whether his belief was reasonable.

True, the doctrines of perfect and imperfect self-defense cannot be invoked by a defendant who " 'through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), . . . has created circumstances under which his adversary's attack or pursuit is legally justified.' (*People v. Enraca* (2012) 53 Cal.4th 735, 761.)" (Maj. opn., p. 20; see also *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179–1180 ["[T]he defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant."].) However, these are questions for the jury to decide, and the record evidence on this point was arguably conflicting.

There was no evidence Zumini initiated a physical attack before Tony advanced on him. There was evidence he brandished his gun while yelling at Lizotte. To the extent an inference of danger arose from the brandishing, there was also evidence supporting a contrary inference, since Zumini testified he had displayed the gun to Tony in the past, without pointing it at

Tony or shooting it.[9]  On the whole, even on this incomplete factual record, there was substantial evidence triggering the trial court's sua sponte duty to instruct the jury on Zumini's self-defense claims.  The majority opinion's implied criticism of the trial court's "election" to give these instructions is therefore unfounded.  Moreover, if the instructions were given improvidently, then how can they serve as a legitimate basis for finding error in the trial court's decision to exclude evidence otherwise supporting them?

I also find the majority opinion's reasoning to obscure the real issue that is the crux of this appeal.  Its analysis of the relevance of the excluded evidence to the self-defense claims dwarfs its analysis of any other issue.  (See maj. opn., pp. 18–24.)  One might reasonably believe, after reading nothing more than the majority opinion, that self-defense was the primary theory advanced by the defense at trial.  It was not.  The defense relied primarily on the theories that Zumini did not premeditate the murder, and that he acted under provocation.  By devoting disproportionate attention to self-defense, while at the same time quoting, but not questioning, the trial court's criticisms of the evidence to support a self-defense theory, the

---

9    The prosecution's own evidence further countered the inference that Zumini presented a danger even as he brandished the gun.  Lizotte, the prosecution's witness, testified that, in his view, Zumini was "not a threat" and "doesn't scare anybody[.]"  When Lizotte first saw Zumini drive by the night of the shooting, he assumed Zumini was there to try to "[p]erhaps intimidate, show off."  Lizotte thought Zumini would "just make a bunch of noise probably run his mouth and keep driving."  And in response to a juror question asking, "If the defendant called earlier in the day and said that he was coming over later, why would you think that he would not stop to talk?," Lizotte testified, in part, that he "just didn't think the kid [Zumini] had it in him."

47

majority opinion signals doubt about its own conclusion that there was error, or that any error was, in fact, prejudicial.

The majority opinion goes on to "acknowledge that aspects of Zumini's self-defense and heat of passion claims are not compelling." (Maj. opn., p. 29.) It does not say what "aspects" of these claims it finds not compelling. I find it difficult to make any determination regarding the strength of the evidence or the credibility of Zumini's defense, when an entire category of relevant evidence, critical to understanding Zumini's mental state and conduct at the time of the shooting, was eliminated from the case. I am only able to conclude that the excluded evidence was indispensable to the jury's ability to evaluate whether Zumini killed his father with the mental state required to convict him of first degree murder.

Ultimately, I am concerned the trial court will draw the wrong message from the majority opinion's illogical analysis, that its true error was in the giving of the self-defense instructions and not in the erroneous exclusion of the evidence in the first instance. I would be clear: the trial court plainly erred in the exclusion of the defense evidence because it was relevant and admissible to raise a reasonable doubt as to whether Zumini killed deliberately and with premeditation, and to support all of his self-defense and provocation claims. And should Zumini testify at the next trial as he did in the first, there would again be substantial evidence to trigger the trial court's sua sponte duty to instruct on his self-defense claims.

## V.

### *On Remand*

Despite holding that the trial court erred in excluding the defense evidence, the majority opinion simultaneously suggests numerous, unexplained limitations to be imposed when the case is retried. (See maj.

48

opn., pp. 23–24.) We are at this stage because the trial court was unduly and arbitrarily restrictive in imposing prophylactic limitations on the defense trial presentation. I find the limitations articulated in the majority opinion to be unjustified, and I am concerned they will lead to error at the next trial.

*First,* I am troubled by the majority opinion's word choice when referring to the excluded defense evidence. The defense proffer described *physical* assaults and other acts of violence by Tony, in addition to threats and other harmful communications. The first half of the majority opinion labels the defense evidence as evidence of Tony's "threats and violence" (maj. opn., p. 1), Tony's "prior threats" (*id.*, p. 2), "Tony's violent past" (*id.* at p. 7), "Tony's abusive conduct" (*ibid.*), "Tony's prior bad acts" (*id.* at p. 8), the "family history" evidence (*id.* at pp. 9, 11), and so on. I believe, despite the variation in word choice, that these are all references to the same scope of evidence of Tony's threats and acts of violence that was proffered by the defense. But when discussing the trial court's errors in excluding the defense evidence, the majority opinion *consistently* refers to the erroneously excluded evidence only as Tony's "prior threats" (maj. opn., pp. 21, 23, 25, 26, 27, 28) or "specific threats" (maj. opn., pp. 23, 27). By referring to the defense evidence broadly in the first half of the opinion as evidence of *threats and violence*, and then describing the erroneously excluded evidence as evidence of *threats*, the majority opinion seems to suggest it is concluding that only a subset of the defense evidence—the evidence relating to Tony's harmful *communicative* acts—was erroneously excluded.

The phrasing in the majority opinion is confusing and could lead to error at the next trial. To the extent it holds that the trial court was within its discretion to exclude evidence of Tony's physical acts of violence—such as knife assaults, dangerous car chases, stalking, and other violent assaults—I

49

disagree. " '[A] defendant is entitled to have a jury take into consideration *all the elements* in the case which might be expected to operate on his mind.' " (*Humphrey*, *supra*, 13 Cal.4th at p. 1083, italics added.) Just as Tony's threats of violence are relevant, evidence of Tony's physical violence against or known to Zumini is also relevant and admissible to explain Zumini's perceptions of Tony, and the jury should be permitted to consider this evidence in evaluating whether Zumini acted with the mental state required for first degree murder. (*Davis*, *supra*, 63 Cal.2d at p. 656 [violence]; *Minifie*, *supra*, 13 Cal.4th at p. 1066 [threats coupled with reputation for violence]; *Humphrey*, at p. 1086 [threats and violence]; *People v. Garvin* (2003) 110 Cal.App.4th 484, 488 [threats or assaults]; CALCRIM No. 505 [jury entitled to consider whether the decedent "threatened or harmed the defendant [or others] in the past"].) Contrary to what the majority opinion intimates, the trial court lacks the discretion to exclude evidence of Tony's acts of violence as irrelevant.

*Second*, the majority opinion states, "the court was required, *at a minimum*, to *permit Zumini to testify* regarding prior threats Tony made that Zumini was personally aware of at the time he committed the shooting, and *which occurred in the months preceding the shooting*." (Maj. opn., p. 24, italics added.) I am concerned the trial court may take this as a signal that it will have discretion to admit only this "minimum" when the case is retried. If it does, I believe it will risk committing reversible error yet again. The majority opinion might be taken to suggest the trial court will have discretion to preclude *all* defense fact witnesses other than Zumini from testifying. To be clear, Zumini is entitled to present, in addition to his own testimony, witnesses to corroborate his account so that the jury can assess the credibility of the defense case. (*Crane*, *supra*, 476 U.S. at pp. 690–691; see *Davis*, *supra*,

50

63 Cal.2d at p. 657 ["Defendant was entitled to bolster his claims by corroborating testimony in his attempt to influence the jurors to a more favorable finding."]; *Minifie*, *supra*, 13 Cal.4th at p. 1066 ["A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence 'tend[ing] in reason to prove' that the fear was reasonable."].)

I also disagree with the majority opinion's intimation that the defense evidence, including Zumini's own testimony, might permissibly be restricted to evidence of Tony's aggressions during "the months preceding the shooting." (Maj. opn., p. 24.) The violent events from Zumini's childhood are plainly relevant to the charge of first degree murder since, in Ferry's expert opinion, they caused him to develop the psychological disorders that affected his mental state at the time of the homicide. (See *Cortes*, *supra*, 192 Cal.App.4th at pp. 899–900, 910 [holding the trial court erred in precluding the defense psychiatric expert from testifying about, among other things, "defendant's upbringing and traumatic experiences as a child and/or adolescent" because they were relevant to his opinion that the defendant's PTSD and dissociative state affected his mental state and behavior].) The defense proffer also identified events from Zumini's adolescence and adulthood relevant to the jury's ability to understand his complex dynamic with Tony, including his reasons for wanting to intimidate Tony but not kill him. The defense explained how these experiences from throughout Zumini's life informed Zumini's actions and perceptions leading up to and during the homicide, and thereby demonstrated that they, too, are relevant and worthy of consideration by a jury.

The majority opinion's suggestion that the trial court may nevertheless have discretion to exclude evidence of Tony's "threats" that occurred outside

51

"the months preceding the shooting" appears to be derived from its assertion earlier in the same paragraph that prior threats "too remote in time to the occurrence of the crime" are less probative, and subject to exclusion. (Maj. opn., pp. 23–24, citing § 352, *People v. Shoemaker* (1982) 135 Cal.App.3d 442 (*Shoemaker*), and *People v. Gonzales* (1967) 66 Cal.2d 482 (*Gonzales*).) The majority opinion does not explain why threats that occurred more than "the months preceding the shooting" would be "too remote."

Section 352 does not use the word "remote" and does not purport to prejudge remote events as less probative. (See § 352 ["The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."].) The authorities cited by the majority opinion are inapposite; neither *Shoemaker* nor *Gonzales*, stand for the proposition that a victim's assaultive conduct was not probative if it happened more than several months before the crime. More importantly, neither case addressed the admissibility of evidence of a *victim's death threats and attacks against the defendant*, which would have far greater probative value than character evidence unrelated to the defendant or the charged crime. (See *Shoemaker*, *supra*, 135 Cal.App.3d at p. 448 [addressing the admissibility of *subsequent* violent acts by the victim to prove the victim had a violent character and was the aggressor in the assault]; *Gonzales*, *supra*, 66 Cal.2d at pp. 499–500 [addressing the admissibility of reputation evidence gathered seven years before the homicide to prove one of the decedent's associates was a turbulent, " 'assaultive type' " person].) And as *Cortes* demonstrates, a defendant's "remote" experiences can be highly probative of his mental state and conduct at the time of the offense. (See

52

*Cortes*, *supra*, 192 Cal.App.4th at pp. 899–900, 910.) The majority opinion's suggestion that Tony's threats and acts of violence that happened earlier than the "months preceding the shooting" are less probative is therefore unjustified, particularly under the circumstances of this case. (Maj. opn., p. 24.)

*Third*, the majority opinion addresses the admissibility of facts to support Ferry's opinions in a footnote that I find difficult to decipher. (See maj. opn., p. 24, fn. 6.) It seems to conclude that the trial court had the discretion to prevent the defense from putting on *any* fact witness to testify based on personal knowledge to the events Ferry was relying on for his opinions. The rationale seems to be that because Ferry's opinions were based on events from "Zumini's early childhood"—which, after all, is just a segment of the " 'entire history of the relationship" between Zumini and Tony—the court was justified in admitting no foundational evidence at all to support Ferry's opinions. (*Ibid.*) This, it seems to me, is clearly incorrect. The defense had a right to prove the case-specific events on which Ferry relied for his opinions through its fact witnesses. (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) I also disagree that Ferry's opinions were based only on Zumini's "early childhood." (Maj. opn., p. 24, fn. 6.) Ferry testified at the 402 hearing that Zumini developed complex PTSD when he was between two and 11 years old (the "early childhood" years the majority appears to be referring to). However, he was not limited to opining about Zumini's *development* of particular psychological diagnoses. Ferry was permitted to testify that Zumini *suffered* from these diagnoses *at the time of the homicide*. At the 402 hearing, Ferry testified to factors that supported this opinion, some of which involved events that happened when Zumini was "a teenager" and "certainly as an adult."

53

## VI.

### *The Errors Were Prejudicial Under* Chapman

The majority opinion does not decide whether the trial court's evidentiary errors violated the federal Constitution. I conclude they did. I would therefore hold that the harmlessness of the trial court's errors must be reviewed under the test promulgated in *Chapman, supra*, 386 U.S. 18.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294 (*Chambers*).) "Few rights are more fundamental than that of an accused to present witnesses in his own defense." (*Id.* at p. 302) "Logically included in the accused's right to call witnesses whose testimony is 'material and favorable to his defense,' [citation], is a right to testify himself, should he decide it is in his favor to do so." (*Rock, supra*, 483 U.S. at p. 52.) After all, "the most important witness for the defense in many criminal cases is the defendant himself" (*id.* at p. 52), as it is " 'the accused, who above all others[,] may be in a position to meet the prosecution's case' " (*id.* at p. 50). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present *a complete defense*.' " (*Crane, supra,* 476 U.S. at p. 690, italics added; accord *Holmes, supra,* 547 U.S. at pp. 324–325; *Rock*, at pp. 51–52.)

Important though they are, these rights are "subject to reasonable restrictions." (*United States v. Scheffer* (1998) 523 U.S. 303, 308.) "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d

54

826, 834.) "In any given criminal case[,] the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence," and the Constitution leaves to trial judges " 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' " (*Crane*, *supra*, 476 U.S. at pp. 689–690.) The right to present a complete defense, however, "is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are ' "arbitrary" or "disproportionate to the purposes they are designed to serve." ' " (*Holmes*, *supra*, 547 U.S. at p. 324.) Thus, courts have recognized that "completely excluding evidence of an accused's defense theoretically could rise to [the level of a constitutional violation]," while "excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103; accord *People v. Lucas* (2014) 60 Cal.4th 153, 279.) Where the errors are of constitutional dimension, the test for harmlessness is "the stricter beyond-a-reasonable doubt" standard set forth in *Chapman*. (*Fudge*, at p. 1103.)

Three decisions by the United States Supreme Court finding the exclusion of defense evidence violated the defendant's constitutional right to present a defense are instructive here.

In *Chambers*, the defendant stood trial for the murder of a police officer. He called as a witness a man named McDonald, who had previously given a sworn written confession and told three other witnesses that he shot the police officer. When McDonald repudiated his confession on the stand, the defense was not permitted to cross examine McDonald as an adverse witness based on Mississippi's " 'voucher' " rule, which barred parties from impeaching their own witnesses, or to call the three other witnesses to whom

McDonald confessed because the state hearsay rule did not include an exception for statements against penal interest. (*Chambers*, *supra*, 410 U.S. at pp. 287–294.) Even though the defense was able to "chip[ ] away at the fringes of McDonald's story by introducing admissible testimony from other sources" and was able to admit evidence of the recanted written confession, the high court held the excluded evidence rendered his defense "*far less persuasive* than it might have been had he been given the opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted." (*Id.* at p. 294, italics added.) Noting the state had not advanced any rational justification for its evidentiary rules, the Court concluded the exclusion of "this critical evidence, coupled with the [s]tate's refusal to permit [the defendant] to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." (*Id.* at pp. 297, 302.)

In *Crane*, a 16-year-old defendant stood trial for the shooting death of a liquor store clerk. He sought to introduce evidence at trial that his confession to the police was unreliable because of the "physical and psychological environment in which the confession was obtained." (*Crane*, *supra*, 476 U.S. at p. 684.) The trial court had previously ruled the confession was voluntary in denying the defendant's motion to suppress. (*Id.* at p. 685.) After the defense in opening statement told the jury "evidence bearing on the length of the interrogation and the manner in which it was conducted would show that the statement was unworthy of belief," the prosecution moved to preclude the defense from introducing such evidence. (*Ibid.*) The trial court agreed with the prosecution that the evidence was relevant only to " 'voluntariness' " of the confession, a " 'legal matter' " it had already determined. (*Id.* at pp. 685–686.) It thus ruled the defense could inquire into inconsistencies

56

within the confession, but it "would not be permitted to 'develop in front of the jury' any evidence about the duration of the interrogation or the individuals who were in attendance." (*Ibid.*)

The *Crane* court held the trial court's evidentiary ruling deprived the defendant of his right to a fair opportunity to present a defense. (*Crane, supra*, 476 U.S. at p. 687.) It explained the manner in which a statement is extracted can be relevant to the purely legal question of its voluntariness, but "can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise . . . unworthy of belief.' " (*Id.* at pp. 688–689.) Thus, "*stripped of the power to describe to the jury the circumstances that prompted his confession*, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" (*Id.* at p. 689, italics added.)

The *Crane* court thus had "little trouble concluding on the facts of this case that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." (*Crane, supra*, 476 U.S. at p. 690.) The opportunity to be heard afforded by the Due Process Clause "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." (*Ibid.*) And "[i]n the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' " (*Id.* at pp. 690–691.)

In *Holmes*, the Supreme Court held a defendant's federal constitutional rights were violated by a state evidentiary rule that precluded him from introducing proof of third-party guilt, in a case where the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict. (*Holmes*, *supra*, 547 U.S. at pp. 323–324, 331.) The Court found that the rule "appears to be based on the . . . logic" that "[w]here (1) it is clear that only one person was involved in the commission of a particular crime and (2) there is strong evidence that the defendant was the perpetrator, it follows that evidence of third-party guilt must be weak. But this logic depends on an accurate evaluation of the prosecution's proof, and the true strength of the prosecution's proof cannot be assessed without considering challenges to the reliability of the prosecution's evidence. . . . *And where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact*." (*Id.* at p. 330, italics added.) Because the rule was " 'arbitrary' " and the state had not identified any legitimate end that it served, the rule deprived the defendant of " ' "a meaningful opportunity to present a complete defense." ' " (*Id.* at p. 331.)

A comparison of this case with the foregoing cases compels the conclusion that the trial court's errors in this case violated Zumini's fundamental right to a meaningful opportunity to present a complete defense. The trial court's errors went to the very heart of Zumini's defense to first degree murder. By excluding Zumini's own testimony and corroborating witness testimony on Tony's threats and acts of violence against Zumini and his loved ones, the trial court effectively took from the jury the determination of the only disputed issue of consequence in this case: Zumini's mental state

at the time of the shooting and his level of culpability. The trial court's ruling resulted in a complete exclusion of Zumini's defense, not merely evidence on a minor or subsidiary point. The deprivation of Zumini's defense was at least as substantial as in *Chambers*, *Crane*, and *Holmes*.

As in *Crane*, the excluded evidence of Tony's threats and acts of violence was "highly relevant" to the jury's evaluation of Zumini's testimony that although he killed his father, he did not do so deliberately or with premeditation. (*Crane*, *supra*, 476 U.S. at p. 688.) Zumini's ability to defend against the charge of first degree murder depended entirely on his ability not only to deny that he acted with the mental state alleged by the prosecution, but to do so credibly. It was essential that the jury hear Zumini's explanation of his behavior from Zumini himself. It was equally important that the defense be permitted to corroborate Zumini's account through the testimony of other witnesses. As in *Crane*, Zumini was "stripped of the power to describe to the jury the circumstances that prompted" him to drive to his father's house armed with a gun and then shoot his father, if the murder was not premeditated. (*Id.* at p. 689.)

As in *Crane*, the trial court's rulings effectively resulted in a "blanket exclusion" of all evidence that would have allowed Zumini to explain his behavior, motivations, and perceptions, and to negate the inference of culpability that the jury would naturally infer from his conduct. (*Crane, supra,* 476 U.S. at p. 690; see *Minifie*, *supra*, 13 Cal.4th at pp. 1065–1066 [a defendant claiming self-defense is entitled to prove the fear that prompted his assault was reasonable; "The defendant's perceptions are at issue, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an individual may color a person's perceptions of that individual."].) An entire category of evidence necessary to

every mental state defense on which Zumini sought to rely was removed from the jury's consideration.

No rational justification for the exclusion of this evidence has been presented. The trial court rejected out of hand the defense argument that its evidence was relevant and admissible to negate the claim of a deliberate, premeditated murder. On appeal, the People concede they "have found no published authority" supporting exclusion on relevance grounds of evidence of a victim's prior threats and acts of violence against a defendant "to reduce murder from first to second degree." Thus, not only was the trial court's exclusion of the defense evidence categorical, but its ruling lacked a legitimate legal basis. Indeed, as in *Holmes*, the record in this case suggests the logic of the court's rulings appears to have rested on its determination that because the prosecutor's case of first degree murder was "legally pretty solid," any defense evidence to the contrary must be weak.

Moreover, the prosecution did not dispute the specific events of violence by Tony against Zumini and his family had occurred; it only "disput[ed] *what* happened during these incidents" and even sought to present its own version of what happened during the summer of 2013. (Italics added.) The trial court stated it did not doubt the defense contention that Tony "was horrific and horrible to [Zumini]," rather it "believe[d] [the specific events] occurred." And the defense had identified numerous witnesses who had percipient knowledge of Tony's disturbing history of abuse and violence against Zumini and his family, as well as evidence of Tony's menacing voicemails and text messages.

Before concluding my analysis, a word on the effect of the trial court's "prima facie case" requirement. As I have discussed, the court required Zumini to testify "*backwards*" and testify to his commission of the homicide

60

*before* it would consider allowing him or any other defense witness to testify about the events he sought to rely on to explain his mental state. The court's imposition of this requirement bears a strong resemblance to a procedural rule held unconstitutional in *Brooks v. Tennessee* (1972) 406 U.S. 605. In *Brooks*, a Tennessee statute required the defendant to testify first, before he could call any other witness. (*Id.* at p. 607.) The United States Supreme Court held the rule cast too heavy a burden on a defendant's "otherwise unconditional right not to take the stand." (*Id.* at pp. 610–611.) It further held the rule impermissibly "restrict[ed] the defense—particularly counsel— in the planning of its case." (*Id.* at p. 612.) These same observations apply to the "prima facie case" requirement adopted by the trial court here. The court intruded into defense counsel's ability to control the presentation of his client's testimony just as surely as the Tennessee procedural rule held unconstitutional in *Brooks*.

For all these reasons, I would conclude the trial court's errors must be reviewed for harmlessness under the stricter test articulated in *Chapman*. Applying that standard to the trial court's rulings in this case, I concur with the majority that the court's errors were not harmless. (Maj. opn., p. 29.)

The only issue the defense sought to contest at trial was Zumini's mental state for first degree murder. As a result of the trial court's erroneous rulings, every fact on which the defense sought to rely to explain Zumini's mindset and behavior during the commission of the offense, and to support the credibility of Zumini's claim that he acted with a different mental state than the mental state of which he stood accused, was excluded. Zumini was thus confined to making bare assertions about his mental state, unable even to explain his own assertions.

61

Zumini was permitted to testify he was afraid his father would kill him; he was not allowed to say why. He was allowed to testify that he went to Tony's house intending to confront Tony, because he had been "making threats"; he was unable to say the threats were *death* threats, that they had been levied against Zumini and his child's mother. He was allowed to testify he confronted Tony because he did not want him "bringing people by the house"; he was not permitted to explain that "bringing people by the house" did not refer to an uninvited social visit. The jury never heard that Tony had attacked Zumini multiple times with his knife; that Tony had also assaulted Asaad and Zumini's baby; that Tony had conveyed his desire to kill Zumini to numerous people; and that Tony showed Asaad a handgun and said he was going to use it on Zumini. Deprived of these facts, the jury could not conceivably understand Zumini's perception of Tony. Lacking information that Tony had been stalking Zumini's house and had threatened to shoot at his house *only 10 days before the homicide*, the jury was surely unable to appreciate the significance to Zumini of the news received after 5:00 p.m. on the day of the homicide that his father had been seen parked on Zumini's street early that very morning.

Additionally, there is no denying "[t]he prosecutor took full advantage of the [trial] court's ruling in closing argument." (*Cortes, supra*, 192 Cal.App.4th at p. 912.) However, the majority opinion offers only the most benign elements of the prosecutor's closing argument. The prosecutor capitalized on the trial court's rulings, assuaging the jury to ignore its natural curiosity by telling them "[t]hings in this case are exactly what they appear to be" and that "[o]n the defendant's side[, they] really only have the defendant's word" and he "has a motive to lie." He asserted that Zumini had studied "all the police reports, all the witness statements[,] [a]ll the

62

photographs, all the forensic evidence," and "with that information[,] he was able to come up with an explanation for what he did."[10]  Even so, according to the prosecutor, "[t]here were so many holes in this man's story."  The prosecutor's arguments require the reminder that a "[s]uccessful prosecution is defined not by the result, but by the process," and the "whole job of the trial prosecutor" is to "[p]rovide a fair trial." (*People v. Force* (2019) 39 Cal.App.5th 506, 508–509.)  His arguments undoubtedly increased the harm caused by the trial court's deprivation of Zumini's right to present a complete defense and to have the prosecutor's case "encounter and 'survive the crucible of meaningful adversarial testing.' " (*Crane*, *supra*, 476 U.S. at pp. 690–691.)

I agree with the majority it is likely the jury would have convicted Zumini of a lesser offense had it been given the benefit of the excluded evidence.  But I have little difficulty concluding on the facts of this case that this is that rare case where the trial court's erroneous evidentiary rulings deprived the defendant of his constitutional rights under the Sixth and Fourteenth Amendments, and these errors were not harmless beyond a reasonable doubt.

DO, J.

---

10     The prosecutor surely was aware Zumini told the police, on the night he was arrested, about the history of Tony's violence and Zumini's fear of Tony.  According to the detective's crime report *dated September 6, 2013*, Zumini told the police that "[Tony] had threatened to murder his girlfriend and daughter.  [Zumini] also stated that [Tony] had something special for him and his brother but did not know what; he believed [Tony] was going to hurt him."  Zumini had also told the police that his neighbor told him, on the day of the homicide, that Tony's car was seen parked on his street in the early morning hours of September 6.